# EXHIBIT A

| | |
|---|---|
| DISTRICT COURT, PITKIN COUNTY, STATE OF COLORADO<br>109 8th Street<br>Glenwood Springs, CO 81601<br><br>**PLAINTIFF:** DANIEL ESTEBAN CAMAS LÓPEZ, individually and on behalf of all similarly situated persons<br><br>**v.**<br><br>**DEFENDANT:** MARRIOTT INTERNATIONAL, INC. | DATE FILED: October 20, 2023 4:19 PM<br>FILING ID: EDE5E556E472E<br>CASE NUMBER: 2023CV30109<br><br><br><br><br>☐     COURT USE ONLY     ☐ |
| Attorneys for Plaintiffs:<br><br>Alexander Hood, Atty Reg. # 42775<br>Brianne Power, Atty Reg. # 53730<br>Towards Justice<br>PO Box 371680, PMB 44465<br>Denver, CO 80237-5680<br>720-239-2606<br>alex@towardsjustice.org, brianne@towardsjustice.org | Case Number:<br><br><br><br><br><br><br>Ctrm/Div: |
| **CLASS ACTION COMPLAINT** ||

## INTRODUCTION

1. This case is brought on behalf of a proposed class of former employees of the St. Regis Hotel in Aspen, Colorado. Plaintiff Daniel Esteban Camas López, alleges that he and other workers were recruited to the St. Regis with the false promise of an "internship" under the J-1 Visa internship program, when in fact the St. Regis exploited Plaintiff and the class for low-wage, menial work in direct violation of state and federal law.

2. Plaintiff is a citizen of Mexico and studied culinary arts in Mexico.

3. As part of his continued education in his chosen field, Plaintiff came to the United States to participate in the J-1 visa internship program.

4. In the fall of 2020, Plaintiff came to Colorado to begin J-1 Visa internship.

5. After the closure of the hotel where he began his internship, Plaintiff transferred to the St. Regis Hotel, an upscale hotel in Aspen, Colorado, to complete his internship program.

6. However, once there, Plaintiff learned that few things St. Regis promised him about the internship were in fact true.

1

7. The Exchange Visitor Program, a J-1 visa internship is intended to be an educational and cultural exchange between people of the United States and other countries that provides intern-participants with degrees from higher education institutions with hands-on experience and training.

8. Importantly, the J-1 visa internship visa program must not be used by employers as a "substitute[] for ordinary employment or work purposes" or to displace domestic workers. 22 C.F.R § 62.22(b).

9. Unlike "ordinary" employment, the J-1 visa internship visa program restricts the ability of participants to leave their jobs to seek out work that may pay them more or treat them better.

10. And, unlike non-immigrant guest workers on temporary or seasonal visas like H-2B visas, whose travel and visa expenses are covered by their employers, participants in the J-1 visa internship visa program must pay costly fees for the promised cultural and educational opportunity.

11. In other words, participants in the J-1 visa internship program have limited bargaining power and must pay for the costs of their employment. In exchange, employers are supposed to provide them with meaningful cultural and educational opportunities.

12. Defendant Marriot International, Inc. ("Defendant") brings J-1 visa interns to the U.S. to work at the St. Regis Hotel, an upscale hotel in Aspen, Colorado.

13. The J-1 visa interns pay costly fees to their visa sponsor in exchange for the opportunity to receive promised training and cultural experiences.

14. The J-1 visa interns work in a variety of positions across the hotel, including as culinary workers, servers, food runners, butlers, and room service.

15. Pursuant to the program, Defendant was required to create a "Training/Internship Placement Plan" for each intern-participant.

16. Defendant was also required to certify to the United States Department of State ("State Department") that the hotel would follow its internship plan for each intern-participant.

17. At the beginning of Plaintiff's internship at St. Regis, Defendant provided him with the hotel's promised internship plan. *See* Exhibit 1 (the "Plan").

18. Defendant also provided the promised internship plan to the State Department, who relied on Defendant's certifications issuing Plaintiff's J-1 visa.

19. But Defendant did not provide the internships it promised in the training plans provided to Plaintiff, those similarly situated, and the State Department.

20. Instead, contrary to law, Defendant used J-1 visa interns as "substitutes for ordinary employment or work purposes" at St. Regis.

## PARTIES, JURISDICTION, AND VENUE

21. At all times material to the allegations of the complaint, Plaintiff was a citizen of Mexico who resided in Colorado.

22. Defendant is a Deleware Corporation with its principal place of business in the State of Wisconsin.

23. Venue in this Court is proper pursuant to C.R.C.P. 98 Defendant is not a resident of Colorado.

24. This Court has jurisdiction over the parties and subject matter of this action pursuant to C.R.S. § 13-1-124 and the Colorado Constitution.

## FACTUAL BACKGROUND

### A. The J-1 Visa Internship Program

25. Created by the Mutual Educational and Cultural Exchange Act of 1961, the J-1 visa internship program—also known as the Exchange Visitor Program—is intended to "increase mutual understanding between the people of the United States and the people of other countries by means of educational and cultural exchange." Pub. L. No. 87-256, 75 Stat. 527, *codified at* 22 U.S.C. § 2451 *et seq.*

26. The J-1 visa internship program seeks to do so by "enhanc[ing] the skills and expertise of exchange visitors in their academic or occupational fields through participation in structured and guided work-based training and internship programs and to improve participants' knowledge of American techniques, methodologies, and technology." 22 C.F.R § 62.22(b).

27. J-1 visa interns "***must not*** be used as substitutes for ordinary employment or work purposes; nor may they be used under any circumstances to displace American workers." *Id.* (emphasis added).

28. The State Department administers the J-1 visa internship program.

29. To obtain visas for J-1 interns, employer-participants are required to submit Training/Internship Placement Plans to the State Department detailing the training and internships they intend to provide to intern-participants.

30. Employer-participants are required to certify the truth of the statements made in the Training/Internship Placement Plans, including promises to comply with all relevant laws and regulations, under penalty of perjury.

### B. Defendant Promised Plaintiff an Internship

31. Defendant owns and operates the St. Regis Hotel in Aspen, Colorado.

32. In 2019, Plaintiff graduated from Universidad Autónoma de Queretaro in Mexico

3

with a degree in Culinary Arts.

33. After receiving his degree, Plaintiff looked for internships at American hotels to continue his education and bolster his career in culinary arts.

34. In the fall of 2020, Plaintiff came to Colorado to begin a culinary internship.

35. Alliance Abroad Group, LP ("Alliance") sponsored Plaintiffs' J-1 visa.

36. In order to participate in the program, Plaintiff paid Alliance a total program fee of $3,900.00, consisting of an inscription fee of $100.00, a down-payment of $900.00, and a deferred program fee of $2,900.00 split into 10 monthly payments of $290.00.

37. In addition, if Plaintiff and those similarly situated left their internships early, they owed a financial penalty to Alliance.

38. Upon information and belief, Defendant was aware that its J-1 visa interns would be obligated to pay this penalty if they left their internships early.

39. After the closure of the hotel where he began his internship, Plaintiff transferred to the St. Regis Hotel in May 2021, to complete his J-1 visa internship program.

40. Once he arrived, Defendant's employee Darren Zemnick, the human resources director for St. Regis, provided Plaintiff a Training/Internship Placement describing his promised internship. *See* Exhibit 1 (the "Plan").

41. The Plan was completed on a form from the State Department, which explains: "Each Training/Internship Placement Plan should cover a definite period of time and should consist of definite phases of training or tasks performed with a specific objective for each phase. The plan must also contain information on how the trainees/interns will accomplish those objectives (e.g. classes, individual instruction, shadowing). Each phase must build upon the previous phase to show a progression in the training/internship. A separate copy of pages 3 and 4 must be completed for each phase if applicable (e.g.; if the trainee/intern is rotating through different departments)." *Id.* at 3.

42. Plaintiff's Plan provided that his internship would have five phases.

43. First, Phase 1: a week-long orientation from May 6 to May 13, 2021, supervised by Mr. Zemnick including a company orientation and an initial orientation to the kitchen. *Id.* at 3-4.

44. Second, Phase 2 from May 14 to July 3, 2021, focused on food preparation and presentation, supervised by Executive Chef Carlos Sierra. *Id.* at 5.

45. The Plan describes Phase 2 as "the preparatory stage of the culinary training program," where Plaintiff's role "is to assist the chef in preparing food, measures [sic] ingredients and prepares them in accordance to chef's specifications," including "chopping vegetables, breaking down, cutting or grinding meat, weighing and mixing ingredients, preparing vegetables and storing food." *Id.*

4

46. The Plan promised Plaintiff would learn "through shadowing and hands on training," that he would "attend all department meetings, briefings, and trainings," and that "regular meetings w[ould] be held to discuss the participant's performance and progress." *Id.*

47. Third, Phase 3 from July 4 to August 30, 2021, focused on saucier / garde manager department rotation, supervised by Executive Chef Carlos Sierra. *Id.* at 7.

48. For Phase 3, the Plan stated that Plaintiff would participate in training in the Saucier Department and as a Garde Manager by attending a one-week culinary department training hosted by St. Regis, receiving "guided mentoring" by the department head, and "assisting and shadowing" their immediate supervisor, Executive Chef Carlos Sierra. *Id.*

49. Fourth, Phase 4 from August 13 to October 31, 2021, focused on the hot line station and other culinary skills, supervised by Executive Chef Carlos Sierra. *Id.* at 9.

50. During this phase, the Plan promised Plaintiff would "assist in the hot line station in the kitchen department" in areas such as the Saute, Fish, Roast, Fry, and Grill stations. *Id.*

51. The Plan promised that Plaintiff would also be introduced to the day-to-day operations of the culinary department, including by learning the department's financial budget, evaluating operational strategies to meet the kitchen's financial objectives, and learning preventative measures, inventories, necessities, labor and food costs, and strategies for revenue enhancement and cost containment. *Id.*

52. Finally, Phase 5 from November 1 to November 15, 2021, focused on project learning and cultural immersion supervised by Mr. Zemnick. *Id.* at 11.

53. For Phases 2, 3, and 4, the Plan explained that "Depending on activity levels of the resort, the participant may be asked to assist in other areas of the Food and Beverage (or culinary) department in order to ensure they receive the minimum 32 hours of training per week." *Id.* at 6, 8, 10.

54. However, the Plan promised: "All training will be relevant to the participant's Training Plan and will not include any unskilled activities as defined by the Code of Federal Regulations - 22 CFR 62 Exchange Visitor Program." *Id.*

55. The Plan also promised Plaintiff would participate in cultural activities during Phases 1-4. *Id.* at 3, 5, 7, 9.

56. Specifically, it promised: "The participant will have the opportunity to experience and enjoy the rich culture of the city. Aspen is one of Colorado's favorite year-round resort areas. It offers an interesting history, challenging outdoor recreation opportunities, abundant cultural activities, pleasant climate and beautiful natural scenery." *Id.*

57. The Plan promised that Plaintiff would "train a minimum of 32 hours and a maximum of 40 hours per week for the duration of the program." *Id.* at 3.

58. Overtime training was "allowed provided that the training [wa]s optional, overtime

5

rates appl[ied] according to local wage and labor requirements, and the assigned tasks [we]re in-line with the content of the Training Plan." *Id.*

59. Plaintiff signed the Plan on May 3, 2021. *Id.* at 1.

60. Defendant's agent, Mr. Zemnick, signed the Plan on May 3 and May 4, 2021. *Id.* at 4, 6, 8, 10, 12.

61. In signing the Plan, Mr. Zemnick declared and affirmed "under the penalty of perjury that the statements and information made [in the internship plan] [we]re true and correct to the best of [his] knowledge, information and belief." *Id.*

62. His signature also made a number of certifications, including but not limited to:

   a. He had "reviewed, understand, and will follow this Training/Internship Placement Plan (T/IPP);"

   b. He would "contact the Sponsor at the earliest possible opportunity if [he] believe[d] that the Trainee or Intern [wa]s not receiving the type of training delineated on this T/IPP;"

   c. "The Trainee or Intern named in this T/IPP w[ould] not displace full- or part-time, seasonal or permanent American workers, or serve to fill a labor need;"

   d. He would "conduct periodic evaluations of the Trainee or Intern named in this T/IPP;"

   e. He would "notify the designated Sponsor contact at the earliest available opportunity regarding any concerns about, changes in, or deviations from this T/IPP;"

   f. He was "participating in this Exchange Visitor Program in order to provide the Trainee or Intern named in this T/IPP with training or an internship as delineated in this T/IPP;" and

   g. The internship met "all the requirements of the Fair Labor Standards Act." *Id.*

63. Andrew Dybevik from Alliance signed the Plan on May 13, 2021.

64. Upon information and belief, Defendant and Alliance Abroad Group communicated by mail or wire to formulate the Plan.

65. For each signature, the Plan was sent by mail or wire to the intended signatory.

66. Following those signatures, the Plan was sent by mail or wire to the State Department for approval.

6

### C. **Plaintiff's work did not adhere to the promised internship plan**

67. Plaintiff began working at St. Regis as a J-1 culinary intern in early May 2021.

68. Defendant paid Plaintiff $14/hour for regular hours and $21/hour for overtime hours.

69. Defendant deducted $800/month from Plaintiff's paychecks in exchange for his housing, which was a bed in a shared room in a dilapidated house shared with other J-1 interns that worked for St. Regis.

70. The house was far away, and Plaintiff could only get to work by bus. St. Regis provided Plaintiff a bus pass but deducted the cost from his paycheck.

71. Meanwhile, Plaintiff also continued to pay $290 a month to Alliance for the cost of the internship program.

72. Plaintiff quickly realized that his work at St. Regis did not reflect the promised internship described by the Plan.

73. First, he attended a few eight-hour days of company-wide orientation.

74. The orientation was for all new interns and employees in all departments. It did not include any information or training specific to work in the kitchen.

75. Next, he began working in the kitchen.

76. Plaintiff spent his first week in the kitchen doing "pre-season" work—helping prepare for the kitchen to open the following week.

77. He helped all of the other chefs and cooks with preparation and production, including setting up the line and getting ingredients ready for opening.

78. While Plaintiff performed some of the tasks described in Phase 2 of the Plan, he was not able to work closely with the executive chef, who was supposed to be his direct supervisor, and they did not meet to discuss his progress.

79. Plaintiffs' hours also exceeded the 32- to 40-hour weeks promised in the Plan, and the overtime hours were not optional. He worked approximately 8-hours a day, 6 days a week (an approximately 48-hour week).

80. Once the kitchen opened, Plaintiff's work drastically deviated from the Plan.

81. Instead of focusing on food preparation and presentation (Phase 2, scheduled for 5/14/21 to 7/03/21), Plaintiff was assigned to work on the hot line station (Phase 4, scheduled for 8/13/21 to 10/31/21).

82. Plaintiff worked primarily at the sauté station preparing, cooking, and plating the food and then passing it on to servers.

7

83. During his first week working on the hot line station, he worked with a sous chef named Jared, who primarily worked at the grill station; another J-1 culinary intern, who primarily worked at the cold station; and one or more non-J-1 workers that helped with food preparation.

84. Again, Plaintiffs' hours exceeded the 32- to 40-hour weeks promised in the Plan, and the overtime hours were not optional. He worked approximately 8-hours a day, 6 days a week (an approximately 48-hour week).

85. Again, Plaintiff spent very little time with the executive chef, who was supposed to be his direct supervisor. The executive chef did not provide Plaintiff with feedback or coaching and they did not have meetings to discuss his progress.

86. The other J-1 culinary intern in Plaintiff's section also worked 6 days a week. On days that the other J-1 culinary intern was not working, Plaintiff was in charge of both the sauté station and the cold station. On days that Plaintiff was not working, the other J-1 culinary intern would work both stations.

87. A few weeks into Plaintiff's internship, the non-J-1 workers that had been helping with food preparation were assigned to work on banquets, leaving Plaintiffs' section drastically understaffed. Plaintiff became responsible for all of his usual work running the line plus all of the prep work necessary for his station.

88. Plaintiff began working days of 12 or more hours a day, 6 days a week (at least 72 hours per week). On approximately four occasions, Plaintiff was asked to come in early and work 14- or 15-hour days.

89. Despite these long hours, Plaintiff did not receive the training or experience promised by the Plan.

90. When Plaintiff asked the executive chef if he would train him on management, inventory, food costs, and other areas described by the Plan, he would be ignored. The executive chef would either tell him yes but never provide the training or tell him they might be able to work on those things once they had more staffing in August.

91. When Plaintiff complained about the workload or asked for additional days off to rest, the executive chef told him he might be able to have additional days off once they had more staffing in August.

92. Throughout Plaintiff's internship, no one in the kitchen ever talked about the Plan, reviewed the Plan with him, or demonstrated any effort to fulfill the Plan's promises.

93. Despite the Plan's promises, Plaintiff was also not able to engage in any cultural experiences throughout his internship, nor was there time for him to do so.

94. On an average day, Plaintiff woke up around 8, showered, ate a quick breakfast, and got to the bus station around 10am in order to arrive at work by 11am. He would arrive home after work around midnight. On his one day off per week, he stayed home to rest and sleep in an attempt to recover from the intense workload.

8

95. Plaintiff left St. Regis on or around July 9, 2021.

### D. **Defendant uses J-1 visa interns "as substitutes for ordinary employment or work purposes"**

96. Instead of providing Plaintiff and the other J-1 interns the training promised by their Training/Internship Placement Plans, they treated them as replacements for cheap labor.

97. Throughout Plaintiff's time at St. Regis, he felt that any American worker could fill his role. He noticed that he was simply providing cheap labor for the severely understaffed kitchen.

98. Around June, Defendant hired temporary workers to perform the same duties assigned to Plaintiff and the other J-1 culinary intern. Defendant paid the temporary workers more than it paid the J-1 culinary interns.

99. However, the temporary workers lacked experience and simply added to the J-1 culinary interns' workload, including Plaintiff's. While the J-1 culinary interns were supposed to be receiving training as part of their internship, they instead had to train the new temporary workers.

100. The temporary workers quit after approximately a month of work, and the kitchen continued to be severely under-staffed.

101. Other J-1 visa program participants at St. Regis had similar experiences.

102. For example, some J-1 interns were promised internships that involved working at the front desks, but they were instead assigned tasks such as polishing shoes, doing laundry, and walking guests' dogs.

### CLASS ACTION ALLEGATIONS

103. This is a C.R.C.P. 23 class action on behalf of Plaintiff and a Class for which Plaintiff seeks certification. Pending any modifications necessitated by discovery, Plaintiff preliminarily defines the class as follows:

> ALL J-1 VISA INTERNS WHO WERE EMPLOYED BY DEFEDANT AT THE ST. REGIS HOTEL FROM WITHIN THE APPLICABLE STATUTE OF LIMITATIONS UNTIL FINAL JUDGMENT.

104. This action is properly brought as a class action for the following reasons:

    a. The Class is so numerous that joinder of all Class Members is impracticable.

    b. Numerous questions of law and fact regarding Defendant's liability common to the Class and predominate over any individual issues which may exist, including but not limited to:

        i. Whether Defendant engaged in fraudulent schemes, acts and

9

       misrepresentations to employ J-1 visa interns;

   ii. Whether Defendant engaged in fraud in foreign labor contracting;

   iii. Whether Defendant engaged in mail and wire fraud;

   iv. Whether Defendant engaged in racketeering;

   v. Whether Defendant obtained labor and services from Plaintiff and the proposed class by means of threats of serious harm and threats of abuse of law or legal process; and

   vi. The nature and extent of damages.

  c. Although the exact amount of damages may vary among Class Members, the damages for the Class Members can be easily calculated by a simple formula. The claims of all Class Members arise from a common nucleus of facts. Liability is based on a systematic course of wrongful conduct by Defendant that caused harm to all Class Members.

  d. The claims asserted by Plaintiff are typical of the claims of Class Members and the Class is readily ascertainable from Defendant's records. Plaintiff was subjected to the same rules and policies as all other workers that form the basis of the alleged violation. Defendant applied its policies to Plaintiff just as it did with all Class Members.

  e. Plaintiff will fairly and adequately protect the interests of Class Members. The interests of Class Members are coincident with, and not antagonistic to, those of Plaintiff. Plaintiff is committed to this action and has no conflict with the class members. Furthermore, Plaintiff is represented by experienced class action counsel.

  f. Questions of fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## **COUNT 1: VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT**

### **(FRAUDULENT INTERNSHIPS)**

105. Plaintiff incorporates by reference all paragraphs above.

106. Defendant engaged in deceptive trade practice by offering and engaging Plaintiff and those similarly situated in J-1 visa internships when Defendant always intended, and in fact did, use Plaintiff and those similarly situated as low wage workers in the St. Regis Hotel.

107. The deceptive trade practice occurred in the course of Defendant's business, *i.e.*,

10

owning and operating the St. Regis Hotel in Aspen, Colorado.

108. The deceptive trade practice significantly impacted the public, as Defendant fraudulently importing cheap labor under the guise of legitimate internships undercutting the domestic labor market in Pitkin County.

109. Upon information and belief, Defendant could not employ sufficient domestic labor at the wage rates paid to Plaintiff and those similarly situated.

110. Upon information and belief, rather than increasing wages to the domestic market rate, Defendant engaged in its fraudulent scheme to import low wage foreign workers under the guise of legitimate internships.

111. Plaintiff and those similarly situated were injured in the course of Defendant's deceptive trade practice and Plaintiff and those similarly situated suffered actual damages as a result.

## COUNT 2: VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT

### (HUMAN TRAFFICKING)

112. Plaintiff incorporates by reference all paragraphs above.

113. Defendant engaged in deceptive trade practice by engaging in human trafficking as defined by C.R.S. § 18-3-503 by recruiting Plaintiff and those similarly situated for J-1 visa internships in order to coerce Plaintiff and those similarly situated to provide low wage labor.

114. The deceptive trade practice occurred in the course of Defendant's business, *i.e.*, owning and operating the St. Regis Hotel in Aspen, Colorado.

115. The deceptive trade practice significantly impacted the public, as Defendant fraudulently importing cheap labor under the guise of legitimate internships undercutting the domestic labor market in Pitkin County.

116. Upon information and belief, Defendant could not employ sufficient domestic labor at the wage rates paid to Plaintiff and those similarly situated.

117. Upon information and belief, rather than increasing wages to the domestic market rate, Defendant engaged in its fraudulent scheme to import low wage foreign workers under the guise of legitimate internships.

118. Plaintiff and those similarly situated were injured in the course of Defendant's deceptive trade practice and Plaintiff and those similarly situated suffered actual damages as a result.

### COUNT 3: VIOLATION OF THE COLORADO ORGANIZED CRIME CONTROL ACT ("CCOCA"), C.R.S §§ 18-17-101 *ET. SEQ.*

119. Plaintiff incorporates by reference all paragraphs above.

120. Defendant violated CCOCA by violating C.R.S § 18-17-104.

121. The "enterprise" is defined as including Defendant, Alliance Abroad Group (Plaintiff's J-1 visa sponsor), and any other J-1 visa sponsor that sponsored any member of the proposed class.

122. Defendant and the Enterprise engaged in the fraudulent schemes, acts, and misrepresentations described above, which violate the fraud in foreign labor contracting statute, the mail and wire fraud statutes, trafficking statutes, and the visa fraud statute.

123. By conducting the Enterprise through a pattern of racketeering, Defendant caused the injury of Plaintiffs and those similarly situated, including pecuniary and emotional harm.

124. Among other things, each of these violations caused Plaintiffs and those similarly situated to suffer loss of past, current, and prospective wages, and to spend money and time securing a fraudulent internship.

125. As a result, Plaintiff and those similarly situated suffered damages, including emotional damages, and are entitled to treble damages, fees, and costs as set forth by law.

### COUNT 4: VIOLATION OF THE COLORADO HUMAN TRAFFICKING STATUTE,

126. Plaintiff incorporates by reference all paragraphs above.

127. Defendant engaged in human trafficking as defined by C.R.S. § 18-3-503 by recruiting Plaintiff and those similarly situated for J-1 visa internships in order to coerce Plaintiff and those similarly situated to provide low wage labor.

128. Plaintiff is therefore entitled to damages pursuant to C.R.S. § 13-21-127.

### JURY DEMAND

129. Plaintiff demands a trial by jury as to all issues so triable.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment against Defendant as follows:

1. A finding that all claims in this Complaint are a good faith, non-frivolous claim filed for the express purpose of extending, limiting, modifying, or reversing existing precedent,

law, or regulation; or for the express purpose of establishing the meaning, lawfulness, or constitutionality of a law, regulation, or United States or state constitutional right and the meaning, lawfulness, or constitutionality has not been determined by the Colorado supreme court, or for cases presenting questions under the United States constitution, to the Supreme Court of the United States because the issues triggered by the claims in this Complaint are matters of first impression;

2. Determining that the action is properly maintained as a class action, certifying Plaintiff as the class representative, and appointing Plaintiff's counsel as counsel for Class Members;

3. Ordering prompt notice of this litigation to all potential Class Members;

4. Awarding Plaintiff and Class Members their damages, attorney's fees and litigation expenses as provided by law;

5. Awarding Plaintiff and Class Members their pre-judgment, post-judgment and moratory interest as provided by law;

6. Awarding Plaintiff and Class Members statutory penalties as provided by law; and

7. Awarding Plaintiff and Class Members such other and further relief as the Court deems just and proper.

Respectfully submitted this October 20, 2023.

*s/ Brianne Power*
Alexander Hood
Brianne Power

*Counsel for Plaintiff*