IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-03308-RMR-KAS

DANIEL ESTEBAN CAMAS LOPEZ, individually and on behalf of all similarly situated
persons,

      Plaintiff,

v.

MARRIOTT INTERNATIONAL, INC.,

      Defendant.
_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____
**ENTERED BY MAGISTRATE JUDGE KATHRYN A. STARNELLA**

      This matter is before the Court on Defendant's **Motion to Dismiss Plaintiff's First
Amended Class Action Complaint** [#36] (the "Motion"). Plaintiff filed a Response [#39]
in opposition to the Motion [#36], and Defendant filed a Reply [#40]. The Motion [#36] has
been referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72.
*See Order Referring Motion* [#37]. The Court has reviewed the briefs, the entire case file,
and the applicable law. For the reasons stated below, the Court **RECOMMENDS** that the
Motion [#36] be **GRANTED IN PART**, as to Claims One through Three, and **DENIED IN
PART**, as to Claims Four through Six.

# I. Background[1]

Plaintiff Daniel Esteban Camas López is a Mexican citizen who studied culinary arts. *First Am. Compl.* [#33], ¶ 2. As part of his studies, in the fall of 2020, he came to Colorado for a J-1 visa internship.[2] *Id.*, ¶¶ 3-4. After closure of the hotel where Plaintiff's internship began, he transferred to the St. Regis Aspen, an upscale hotel in Aspen, Colorado, and its owner Defendant Marriott International, Inc. ("Marriott") became the "host organization" for his visa internship. *Id.*, ¶¶ 5-6. Defendant allegedly works with J-1 visa sponsors, including Plaintiff's sponsor Alliance Abroad Group, LP ("Alliance"), "to recruit and obtain labor for the St. Regis Aspen and other hotels and resorts" it owns. ¶¶ 31-32.

Through its participation in the J-1 program, Defendant, through St. Regis's human resources director, made Plaintiff (and the State Department) various promises about what his internship would entail in the form of a Training/Internship Placement Plan. *Id.*, ¶¶ 59, 85; *see also Internship Plan* [#33-1]. Plaintiff was promised a five-phase internship. *First Am. Compl.* [#33], ¶ 61. Phase One would be a week-long orientation, supervised by the human resources director, to include a company internship and an initial kitchen

---

[1] For the purposes of resolving the Motion [#36], the Court accepts as true all well-pleaded, as opposed to conclusory, allegations made in Plaintiff's First Amended Class Action Complaint [#33] and the Internship Plan [#33-1] he attached to it. *See Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Hall v. Bellmon*, 935 F.2d 1106, 1112 (10th Cir. 1991) ("A written document that is attached to the complaint as an exhibit is considered part of the complaint and may be considered in a Rule 12(b)(6) dismissal.").

[2] The purpose of J-1 visa program, administered by the State Department, is to "enhance the skills and expertise of exchange visitors in their academic or occupational fields through participation in structured and guided work-based training and internship programs and to improve participants' knowledge of American techniques, methodologies, and technology." 22 C.F.R. § 62.22(b)(1)(i). However, these interns may "not be used as substitutes for ordinary employment or work purposes; nor may they be used under any circumstances to displace American workers." 22 C.F.R. § 62.22(b)(1)(ii).

orientation. *Id.*, ¶ 62; *Internship Plan* [#33-1] at 3. Phases Two through Five would be supervised by the executive chef and would respectively focus on the following areas: food preparation and presentation; saucier/garde manager department rotation; hot line station and other culinary skills; and project learning and cultural immersion. *First Am. Compl.* [#33], ¶¶ 63, 66, 68, 71; *Internship Plan* [#33-1] at 5, 7, 8, 11. During Phases Two through Four, Plaintiff could be asked to assist in other areas of the culinary department to ensure he received a minimum of 32 hours per week, but all training would be "relevant to the participant's Training Plan and [would] not include any unskilled activities as defined by the Code of Federal Regulations – 22 CFR 62 Exchange Visitor Program." *First Am. Compl.* [#33], ¶¶ 72-73 (quoting *Internship Plan* [#33-1] at 7, 9, 11). Plaintiff's training was capped at a maximum of 40 hours per week, though overtime was permitted so long as it was optional, it complied with local wage and labor requirements, and the assigned tasks were in-line with the Training Plan's content. *Id.*, ¶¶ 76-77 (citing *Internship Plan* [#33-1] at 3).

Plaintiff began working at St. Regis in May 2021 but quickly determined that the program was not what had been promised. *Id.*, ¶¶ 93, 98-99. For example, while Plaintiff was paid a stipend of $14/hour for regular hours and $21/hour for overtime, Defendant deducted $800 each month for housing "in a dilapidated house shared with other J-1 interns that worked for St. Regis." *Id.*, ¶¶ 94-95. The house was far away and, while Defendant provided a bus pass, it also deducted that cost from his paycheck. *Id.*, ¶ 96. Additionally, Plaintiff was "required to work substantially as a general kitchen laborer." *Id.*, ¶ 99. His first week in the kitchen was spent doing "pre-season" work, i.e. helping prepare for the kitchen to open, setting up the line, and preparing ingredients. *Id.*, ¶¶ 103-04. While

some of these tasks were listed in the Phase Two description, Plaintiff was unable to work closely with the executive chef. *Id.*, ¶ 105. At that time, Plaintiff worked approximately 48 hours per week and overtime was mandatory. *Id.*, ¶¶ 107-08.

Once the kitchen opened, Plaintiff's work further diverged from the Plan. Instead of Phase Two's focus on food preparation and presentation, he was assigned to work on the hot line station, which was anticipated to occur in Phase Four. *Id.*, ¶¶ 109-10. He worked primarily at the sauté station preparing, cooking, and plating food, under a sous chef rather than the executive chef, and he continued to work 48 hours per week. *Id.*, ¶¶ 111-13. On days when no other J-1 intern worked, Plaintiff was responsible for both the sauté station and the cold station. *Id.*, ¶ 115. A few weeks later, non-J-1 workers were reassigned to work on banquets, leaving Plaintiff's section understaffed and forcing him to do "all of his usual work running the line plus all of the prep work necessary for his station." *Id.*, ¶ 116. During this time, Plaintiff worked at least 72 hours per week and, on four occasions, he was asked to work 14- or 15-hour days. *Id.*, ¶ 117.

Despite these long hours, Plaintiff never received the promised training or supervision from the executive chef. *Id.*, ¶¶ 118-19. When Plaintiff asked the executive chef if he would be trained on other areas in the Plan, he was ignored. *Id.*, ¶ 119. When Plaintiff complained about the heavy workload and asked for additional days off, the executive chef told him that might be possible once they had more staffing in August. *Id.*, ¶ 120. Because of the heavy workload, Plaintiff was unable to participate in any cultural experiences. *Id.*, ¶ 122. Plaintiff felt that "any American worker could fill his role" of "providing cheap labor for the severely understaffed kitchen." *Id.*, ¶ 136.

When Plaintiff raised concerns to Alliance's agent, the agent warned Plaintiff that a transfer would likely cause him to lose his housing deposit, generate additional fees, and leave him without a guaranteed job placement, which would require him to leave the country. *Id.*, ¶¶ 126-27. Additionally, when Plaintiff articulated his intent to transfer, St. Regis's human resources director informed Plaintiff that, because Aspen is a small town, everyone would know if the executive chef had negative things to say about Plaintiff. *Id.*, ¶ 128. Plaintiff felt threatened and believes the human resources director made that statement to pressure him to stay at the St. Regis. *Id.*, ¶¶ 129-30. Plaintiff eventually left the St. Regis. *Id.*, ¶ 131.

Plaintiff alleges that Defendant, through St. Regis's human resources director, knowingly made false or misleading representations when it offered the Internship Plan, knowing that it planned to use Plaintiff "to fill a labor need [*i.e.*, short fall]" in violation of J-1 program regulations. *Id.*, ¶¶ 82-84. More broadly, Plaintiff alleges that Defendant abused the J-1 visa system "to coerce [him] and other J-1 interns to provide labor that was substantially different from what had been represented to them and to the State Department." *Id.*, ¶ 132. Plaintiff's proposed class includes "all J-1 visa interns who were employed by Defe[n]dant at the St. Regis Aspen Resort from within the applicable statute of limitations until final judgment." *Id.*, ¶ 143 (capitalization omitted).

Plaintiff lodges six claims against Defendant: (1) Violation of the Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. § 6-1-101, *et seq.* – Fraudulent Internships; (2) Violation of the CCPA – Human Trafficking; (3) Violation of the Colorado Organized Crime Control Act (COCCA), Colo. Rev. Stat. § 18-17-101, *et seq.*; (4) Violation of the Colorado Human Trafficking Statute, Colo. Rev. Stat. § 18-3-501, *et seq.*;

(5) Violation of the Trafficking Victims Protection Act (the "TVPA"),[3] 18 U.S.C. § 1589(a); and (6) Violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961, *et seq. Id.*, ¶¶ 145-94.

## II. Legal Standard

Rule 12(b)(6) tests "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). To survive a Rule 12(b)(6) motion, "[t]he complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support plaintiff's allegations." *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[P]lausibility refers to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (internal quotations and citations omitted).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). However, "[a] pleading that offers 'labels and conclusions' or a formulaic recitation of the elements of a cause of action will not do. Nor does the complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citation omitted). The Court's function on a Rule 12(b)(6)

---

[3] Defendant, as well as some courts, refer to 18 U.S.C. § 1589 as the Trafficking Victims Protections <u>Reauthorization</u> Act (or "TVP<u>R</u>A"). *See Motion* [#36] at 5; *see also Bistline v. Parker*, 918 F.3d 849, 862 (10th Cir. 2019) ("TVPRA"). Other courts refer to it as the TVPA, as does Plaintiff. *See, e.g.*, *Gilbert v. U.S. Olympic Comm.*, 423 F. Supp. 3d 1112, 1122 (D. Colo. 2019) ("TVPA"); *First Am. Compl.* [#33] at 24. For consistency, throughout this Recommendation, the Court will use Plaintiff's nomenclature.

motion "is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's amended complaint alone is legally sufficient to state a claim for which relief may be granted." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1135-36 (10th Cir. 2014) (quotation omitted).

### III. Analysis

Defendant moves to dismiss Plaintiff's claims under Rule 12(b)(6), arguing that (1) his trafficking claims fail because he was not recruited by or coerced into working by Defendant and because he has not plausibly alleged venture liability; (2) his CCPA claims fail because he has not sufficiently pleaded fraud against consumers or significant public impact; and (3) that his COCCA and RICO claims fail because the COCCA claims are barred by statute of limitations and he has neither alleged predicate acts nor an enterprise. *See Motion* [#36] at 5-15[4].

Plaintiff responds that (1) he has plausibly pleaded state and federal trafficking claims through Defendant's abuse of the J-1 visa program and through a venture beneficiary theory; (2) his CCPA claims survive because he has plausibly alleged unfair and deceptive trade practices, met Rule 9(b)'s pleading standard, and alleged sufficient public impact; and (3) his COCCA claim is not time-barred and he has sufficiently pleaded two predicate acts and that an enterprise exists. *Response* [#39] at 2-15. The Court considers Defendant's arguments in the order raised.

---

[4] Unless otherwise stated, page number citations for briefs refer to the document's original numbering, not to the numbering stamped on the upper right corners by the electronic docketing system.

## A.    Trafficking (Claims Four and Five)

Plaintiff alleges that Defendant violated both Colorado and federal anti-trafficking laws both as a primary offender and as a participant in a venture with Alliance to procure J-1 visa intern participants to work at St. Regis Aspen under false pretenses. *See First Am. Compl.* [#33], ¶¶ 40-125, 128-30 (alleging Defendant engaged in a bait-and-switch and pressured Plaintiff to continue working); *id.*, ¶¶ 31-35, 126-27 (alleging that Defendant works with visa sponsors like Alliance, whose agent pressured Plaintiff to continue working).

Defendant argues that Plaintiff was not "recruited" or "coerced into working at the hotel" because he willingly came to the United States to participate in Alliance's visa internship program for another hotel, and because he ultimately left the St. Regis program voluntarily. *See Motion* [#36] at 6-9. Defendant downplays the human resource director's warning and asserts that Plaintiff has not alleged any facts showing Marriott knew that Alliance or other sponsors were involved in trafficking, or identified any coercive actions undertaken by Alliance. *Id.* at 7, 9.

### 1.    The TVPA (Claim Five)

The Trafficking Victims Protection Act (TVPA) creates a civil cause of action for victims of human trafficking as defined in 18 U.S.C. § 1589. *See Bistline v. Parker*, 918 F.3d 849, 870 (10th Cir. 2019). The TVPA prohibits anyone from knowingly providing or obtaining labor or services from a person by one or more of the following means:

(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

(2) by means of serious harm or threats of serious harm to that person or another person;

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint[.]

18 U.S.C. § 1589(a).

The TVPA also prohibits anyone from "knowingly benefit[ting]," whether "financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services" through any of the above-listed prohibited acts, "knowing[ly] or in reckless disregard of "the fact that the venture has engaged in the providing or obtaining of labor or services by any such [unlawful] means[.]" 18 U.S.C. § 1589(b).

"[S]erious harm" includes "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2).

Courts "take[] into account the particular vulnerabilities of the [p]laintiffs and the circumstances surrounding their recruitment and employment by [the d]efendants." *Francis v. APEX USA, Inc.*, 406 F. Supp. 3d 1206, 1211 (W.D. Okla. 2019) (citing *Ross v. Jenkins*, 325 F. Supp. 3d 1141, 1164 (D. Kan. 2018)). However, the statute makes clear that a "threat of financial harm constitutes serious harm within the meaning of the TVPA." *Id.* (quoting *Paguirigan v. Prompt Nursing Emp. Agency LLC*, No. 17-cv-1302(NG)(JO), 2018 WL 4347799, at *8 (E.D.N.Y. Sept. 12, 2018)) (internal quotation marks omitted).

Moreover, "whether a trafficking victim actually 'had the opportunity to escape" is irrelevant. *Ross*, 325 F. Supp. 3d at 1164 (D. Kan. 2018) (internal quotation and citation omitted). Rather, courts focus on whether the defendant "intentionally cause[d] the oppressed person reasonably to believe, given [his] special vulnerabilities, that [he] ha[d] no alternative but to remain in involuntary service for a time." *Id.* (quoting *United States v. Alzanki*, 54 F.3d 994, 1000 (1st Cir. 1995)) (first and fourth alterations in original).

A defendant can violate the TVPA "either as a primary offender or simply by benefiting financially from participation in a 'venture' with the primary offender." *Bistline*, 918 F.3d at 871. To state a "venture" liability TVPA claim, a plaintiff "must plausibly allege that they provided labor or services that were procured by a method that is prohibited under the TVPRA, and that defendants knowingly benefited from participating in this venture." *Id.*

## a.    The Alleged Scheme

Here, Plaintiff alleges that Defendant "works with visa sponsors, including [Alliance], in order to recruit and obtain labor for the St. Regis Aspen and other hotels and resorts[.]" *First Am. Compl.* [#33], ¶ 31. He claims that "Defendant coordinates with visa sponsors, including Alliance, in order to create and submit Training/Internship Placement Plans to the State Department." *Id.*, ¶ 35. Additionally, both an Alliance agent and Defendant's agent signed his Internship Plan. *See Internship Plan* [#33-1] at 3 (Alliance agent's signature), 5, 7, 9, 11, 13 (St. Regis's human resource director's signature). The plan contemplated Plaintiff working for 32 to 40 hours per week, with optional overtime permitted. *See, e.g., id.* at 4 (stating that Plaintiff would "train a minimum of 32 hours and a maximum of 40 hours per week for the duration of the program. Overtime training is

allowed provided that the training is optional"). According to Plaintiff, this was untrue: overtime was not optional, and Plaintiff routinely worked 48 hours or more per week, including some weeks of more than 72 hours. *First Am. Compl.* [#33], ¶¶ 108, 117. When Plaintiff expressed concerns to Alliance's agent, that agent pressured him not to transfer by mentioning possible financial penalties and removal from the United States. *Id.*, ¶¶ 126-27.

Plaintiff also alleges that Defendant intentionally seeks out J-1 interns to fulfill its general labor needs because of its inability to otherwise fill those positions with the wages it pays regular employees, and it knows that the J-1 interns are in a vulnerable position. *See First Am. Compl.*, ¶¶ 53, 133. In support of this assertion, Plaintiff alleges that Defendant's kitchen was "severely understaffed" after temporary workers, who were paid more than Plaintiff and other J-1 visa holders, quit. *Id.*, ¶¶ 137-39. He also alleges that Defendant promised other J-1 interns that they would work at the front desk, but instead assigned them tasks like polishing shoes, laundry, and dog walking. *Id.*, ¶ 141.

These allegations sufficiently allege Defendant's participation in a "scheme, plan, or pattern" intended to unlawfully procure ordinary labor from J-1 interns under false pretenses. In essence, the alleged scheme is this: Defendant works with J-1 visa sponsors to procure labor from individuals it knows are in vulnerable situations because they are foreign nationals who have traveled to the United States on a temporary basis, at their own expense. Defendant and the visa sponsors allegedly lure these individuals with signed promises of rewarding internships that Defendant has no intention of honoring. Once these individuals begin working for Defendant, they are expected and pressured to work much longer hours than promised. Whether this pressure is explicit or

not, Defendant knows (due to its use of and ratification of the J-1 visa process) that these interns are vulnerable, which vulnerabilities are exacerbated by required removal from the United States and financial penalties if they quit and are unable to find another host organization. Defendant allegedly relies on these vulnerable interns to fill its general labor needs because it is unable to maintain a sufficient workforce at the wages it pays—as shown by the higher-paid temporary workers quitting during Plaintiff's internship. *Cf. First Am. Compl.* [#33], ¶¶ 137-39. The alleged scheme relies, implicitly if not expressly, on leveraging J-1 interns' vulnerability to obtain labor the interns did not agree to provide.

The Court finds *Francis v. APEX USA, Inc.*, a case from the Western District of Oklahoma, persuasive given its factual similarities. There, the court allowed Jamaican J-1 visa interns' TVPA claims to proceed against hospitality industry defendants who allegedly "recruited Plaintiffs through a J-1 sponsor agency" and collected fees from the plaintiffs while making promises about the wages and quality of employment they would receive. *See* 406 F. Supp. 3d at 1208-10. The defendants did not pay the promised wages and failed to provide J-1 visa holders with suitable or affordable housing, which rendered plaintiffs unable to afford the return travel home, and the defendants caused them to believe that no other employer in town would hire them after a defendant owner told them so. *Id.* at 1210. The defendants also retaliated against two plaintiffs who attempted to find additional employment; made veiled threats of physical harm; suggested they had close ties with local law enforcement; and threatened the plaintiffs with deportation, causing the J-1 interns to feel compelled to continue working. *Id.*

The *Francis* court held that the plaintiffs had plausibly alleged that the defendants engaged in a scheme to cause financial harm: "Defendants acted through a fraudulent

scheme to induce them to work in Oklahoma but then did not provide the employment opportunities as represented," including "misrepresent[ing] the number of hours per week [the] [p]laintiffs could work, the hourly wage rates that would be paid, and that [they] would be able to work multiple jobs." *Id.* at 1211. Given the plaintiffs' debts associated with recruitment and other fees, the plaintiffs felt compelled to continue to work, and this was sufficient for the court to deny the dismissal request. *Id.* at 1212 (citing *David v. Signal Int'l, LLC*, 37 F. Supp. 3d 822, 832 (E.D. La. 2014); *Nuñag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F. Supp. 2d 1134, 1146 (C.D. Cal. 2011)). As in *Francis*, Plaintiff has plausibly alleged that Defendant engaged in a bait-and-switch scheme intended to procure his labor under false pretenses, in violation of 18 U.S.C. § 1589(a)(4).

### b.    Serious Harm

In addition to Defendant's alleged scheme associated with its use of J-1 interns, Plaintiff has alleged that he faced specific threats of serious harm proscribed by 18 U.S.C. § 1589(a)(2). The Court considers his unique vulnerabilities and characteristics. *Cf. Ross*, 325 F. Supp. 3d at 1164; *see also Francis*, 406 F. Supp. 3d at 1211 (considering the plaintiff's particular vulnerabilities and the recruitment and employment circumstances when assessing sufficiency of alleged serious harm and a scheme).

Here, Plaintiff raised concerns with the executive chef twice—once about training and once about the workload and time off—and was brushed off and told things might get better. *First Am. Compl.* [#33], ¶¶ 119-20. Plaintiff continued to raise concerns with Defendant and request work compliant with the plan, but he was ignored. *Id.*, ¶ 125. When things did not improve, Plaintiff raised concerns with Alliance's agent, who told him that he would face financial consequences if he attempted to transfer or leave, including loss

of a housing deposit, a $400-$600 transfer fee, weeks of unemployment, and risk of immediate removal from the United States if he could not find a new host organization (a task with which Alliance would not assist). *Id.*, ¶ 127. Finally, when Plaintiff told St. Regis's human resource director of his intent to transfer, the director issued a veiled threat, telling him that everyone in town would know if the executive chef had negative things to say about Plaintiff. *Id.*, ¶ 128. Plaintiff ultimately left the St. Regis on July 9, 2021. *Id.*, ¶ 131.

Courts have found that "threats of deportation are sufficient to meet the 'serious harm' element under either § 1589(a)(2) or (4)  or 'abuse of the legal process' element under § 1589(a)(3)" even if they are presented as "factual statements regarding failure to meet the requirements of the J-1 visa program, in which [a] plaintiff[] voluntarily participated." *Bucco v. W. Iowa Tech Cmty. Coll.*, No. C21-4001-LTS, 2022 WL 605801, at *6 (N.D. Iowa Mar. 1, 2022) ("Whether plaintiffs could actually be deported for missing work, or had expected to return to their home country after two years, is beside the point.") (citations omitted). Here, the Alliance agent's statements to Plaintiff plausibly amounted to threats of deportation that coerced Plaintiff into continued involuntary labor. Because the threats of deportation were made by Alliance's agent, not Defendant's, the Court will consider in the next section whether Plaintiff has plausibly alleged venture liability under the TVPA. *See First Am. Compl.* [#33], ¶ 181-85 (alleging venture liability).

Interference or threats of interference with other jobs can also constitute serious harm. *See, e.g.*, *Francis*, 406 F. Supp. 3d at 1210 (plaintiffs did not believe they could obtain additional employment and one of the defendants told them they would not get hired anywhere else in town), 1212 (finding sufficiency of allegation that "[the d]efendants engaged in conduct which precluded them from obtaining other employment"). Here, the

St. Regis human resources director's comment that the entire town would know if the executive chef had negative things to say about Plaintiff plausibly amounted to a threat of financial or reputational harm. Plaintiff has plausibly alleged that threat, even though it was allegedly made in response to Plaintiff's notification of his intent to transfer. *See First Am. Compl.* [#33], ¶ 128; *id.* ¶ 129 ("Plaintiff felt threatened by these statements and believed Defendant's agent [St. Regis's human resources director] made the statement in an effort to pressure him to continue working at [St. Regis]."). *See Bucco*, 2022 WL 605801, at *6 (rejecting defendants' argument that "plaintiffs knew and agreed to return to their home country at the conclusion of the visa program", a program "in which [they] voluntarily participated").

### c.  Venture Liability

To state a "venture" liability TVPA claim, a plaintiff "must plausibly allege that [he] provided labor or services that were procured by a method that is prohibited under the TVPRA, and that [the] defendants knowingly benefited from participating in this venture." *Bistline*, 918 F.3d at 871. As discussed, Plaintiff satisfies the first element of venture liability because he allegedly provided labor to Defendant that was procured through at least two means prohibited by the TVPA. Therefore, the Court considers whether Plaintiff adequately alleged that Defendant "knowingly benefited from participating in this venture." *Id.* Though the term "venture" has not been defined in the context of 18 U.S.C. § 1589(b), the Tenth Circuit has drawn from another section of the TVPA, which defines "venture" as "any group of two or more individuals associated in fact, whether or not a legal entity." *Id.* at 873-76 (drawing from and applying definition in 18 U.S.C. § 1591(e)(6)). A member

of a venture need not have committed any overt act in violation of the TVPA to face civil liability. *See Gilbert v. U.S. Olympic Comm.*, 423 F. Supp. 3d 1112, 1138 (D. Colo. 2019).

Here, Plaintiff plausibly alleges that Defendant and Alliance are "associated in fact" because Defendant worked with Alliance "to recruit and obtain labor for the St. Regis Aspen and other hotels and resorts and/or operated by Defendant," and agents for both Defendant and Alliance signed Plaintiff's Internship Plan. *First Am. Compl.* [#33], ¶ 31; *Internship Plan* [#33-1] at 3, 5, 7, 9, 11, 13. He also plausibly alleges that Defendant knowingly benefitted financially from its venture with Alliance in at least two ways: (1) it saved money by obtaining his labor (and other J-1 interns' labor) at below-market wages; and (2) it relied on him (and other J-1 interns) to staff its "severely understaffed kitchen" so it could continue operating, because it could not find other workers. *First Am. Compl.* [#33], ¶¶ 38-39, 133-39. Whether Defendant had no role in recruiting Plaintiff, *see Motion* [#36] at 6, does not matter. *See Gilbert*, 423 F. Supp. 3d at 1138.

Finally, Defendant argues that Plaintiff has not plausibly alleged that it "knew or should have known" that Alliance was engaged in trafficking, as he has not alleged a single coercive action by Alliance let alone [Defendant's] knowledge of any coercive actions." *Motion* [#36] at 9 (citing *J.L. v. Best W. Int'l, Inc.*, 521 F. Supp. 3d 1048, 1060 (D. Colo. 2021)). The Court is unpersuaded.

First, the Court has already found that Alliance's agent engaged in at least one overt "coercive action" in the form of suggesting that financial penalties and removal from the United States would befall Plaintiff if he attempted to transfer from the St. Regis. *See First Am. Compl.* [#33], ¶¶ 126-27. Second, although Defendant correctly suggests that pleading forced labor under 18 U.S.C. § 1589(a)(1)-(3) would require a specific coercive

action, § 1589(a)(4) more broadly penalizes the use of any "scheme, plan, or pattern" intended to put a person in fear of serious harm or physical restraint if he does not perform labor or services. Defendant allegedly offers and signs the Internship Plans; therefore, it knows that the J-1 interns are in vulnerable positions, both financially and in terms of their immigration status. Yet as their host organization, Defendant allegedly expected them to work mandatory overtime, sometimes far exceeding the 32- to 40-hour work week they had agreed to. For these and other reasons already discussed, Plaintiff's allegations render plausible that Defendant knew or recklessly disregarded "the fact that the venture has engaged in the providing or obtaining of labor or services by [means proscribed by 18 U.S.C. § 1589."]" 18 U.S.C. § 1589(b).

In summary, the Court finds that Plaintiff has plausibly stated a venture liability TVPA claim against Defendant. Therefore, the Court **recommends** that the Motion [#36] be **denied** as to Claim Five (TVPA).

### 2. Colorado's Human Trafficking Statute (Claim Four)

Defendant does not raise any arguments specific to Colorado's Anti-Human Trafficking Statute; rather, it relies on its TVPA arguments. *See Motion* [#36] at 5-9. Because the Court has found Plaintiff's federal trafficking allegations sufficient to survive dismissal, and because Defendant raises no separate argument as to the Colorado statute, the Court **recommends** that the Motion [#36] be **denied** as to Claim Four (Colorado Human Trafficking Statute).

### B. Colorado Consumer Protection Act (Claims One and Two)

Plaintiff alleges that Defendant engaged in a deceptive trade practice by offering and engaging him and other J-1 visa applicants in internships while intending to use them

as low-wage workers at the St. Regis Aspen. *First Am. Compl.* [#33], ¶¶ 146-47, ¶¶ 155-56 (similar). He claims that the practice significantly impacts the public because it undercuts the domestic labor market in Pitkin County. *Id.*, ¶¶ 148-52, 157-61. Defendant argues that Plaintiff has failed to sufficiently plead consumer fraud under Rule 9(b), and that allegations of fraudulent internships and human trafficking are not actionable under the CCPA. *Motion* [#36] at 10. It also argues that he has not shown a significant public impact. *Id.* at 11-13.

"The CCPA protects consumers against deceptive business practices by providing a remedy for consumer fraud." *Platt v. Winnebago Indus., Inc.*, 960 F.3d 1264, 1276 (10th Cir. 2020) (citing *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146 (Colo. 2003); COLO. REV. STAT. §§ 6-1-101-115). To state a CCPA claim, a plaintiff must plausibly allege:

    (1) that the defendant engaged in an unfair or deceptive trade practice;

    (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation;

    (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property;

    (4) that the plaintiff suffered injury in fact to a legally protected interest; and

    (5) that the challenged practice caused the plaintiff's injury

*Rhino Linings USA*, 62 P.3d at 146-47 (citing *Hall v. Walter*, 969 P.2d 224, 235 (Colo. 1998)). "[I]f a wrong is private in nature, and does not affect the public, a claim is not actionable under the CCPA." *Id.* at 149. When considering whether a challenged practice has a significant public impact, courts consider: "(1) the number of consumers directly affected by the challenged practice, (2) the relative sophistication and bargaining power

of the consumers affected by the challenged practice, and (3) evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future." *Rhino Linings USA*, 62 P.3d at 149; *see also Sewell v. Great N. Ins. Co.*, 535 F.3d 1166, 1173-74 (10th Cir. 2008) (discussing and applying factors).

Even accepting Plaintiff's framing of Defendant's allegedly deceptive labor practices, Plaintiff's CCPA claims both fail because he fails to allege any impact to the public *as actual or potential consumers* of Defendant's goods, services, or property. Instead, Plaintiff argues that Defendant's alleged abuse of the J-1 visa internship program and trafficking of foreign interns significantly impacts the public *as actual or potential workers*. *See First Am. Compl.* [#33], ¶¶ 148 & 157 (both alleging that the practice "undercut the domestic labor market in Pitkin County"), 149 & 158 (both alleging that Defendant's wages "significantly impact[] the pay rates offered by other employers in Pitkin County"); *see also Response* [#39] at 8-9 (arguing that Plaintiff has plausibly pleaded a significant public impact by alleging that Defendant's practices cause "labor market distortions").

Plaintiff argues that "workers are consumers of jobs and wages in the labor market," an assertion that strains those terms to their breaking point and, if adopted, would turn nearly every wage dispute into a potential CCPA claim. *Response* [#39] at 9. At every turn, the CCPA is concerned with "consumers of the defendant's goods, services, or property"—not with workers, who are protected under other sections of both Colorado and federal law. *Cf. Adams v. FedEx Ground Package Sys., Inc.*, 546 F. App'x 772, 776 (10th Cir. 2013) (stating that "the CCPA does not purport to provide a cause of

action for private employment disputes"); *Rhino Linings USA*, 62 P.3d at 147 (similar); *see also, e.g.*, 29 U.S.C. § 201, *et seq.* (the Fair Labor Standards Act); COLO. REV. STAT. § 8-6-101, *et seq.* (the Colorado Minimum Wage Act).

Because the public is allegedly harmed only *as workers*, not *as consumers* of Defendant's goods or services, Plaintiff has not alleged a public impact relevant to a CCPA claim. Therefore, the Court **recommends** that the Motion [#36] be **granted** as to Claims One and Two (CCPA) and that those claims be **dismissed without prejudice** for failure to state a claim.

## C.     Racketeering (Claims Three and Six)

### 1.     COCCA Statute of Limitations

COCCA does not contain a statute of limitations. *See generally* COLO. REV. STAT. § 18-17-101, *et seq.*; *see also Todd Holding Co., Inc. v. Super Valu Stores, Inc.*, 874 P.2d 402, 405 (Colo. App. 1993) (stating that "no specific statute of limitations is applicable" to COCCA claims). Defendant argues that Colorado's catch-all two-year statute of limitations under Colo. Rev. Stat. § 13-80-102(1)(*i*) applies and, therefore, Plaintiff's claim is barred because he filed it more than two years after his departure date of July 9, 2021. *Motion* [#36] at 13-14 (citing *RMCO Holdings, LLC v. Golden Trading & Transp., LLC*, No. 22-cv-00650-NYW-KLM, 2023 WL 3815069, at *12 (D. Colo. June 5, 2023)).

Plaintiff argues that a five-year statute of limitations applies pursuant to Colo. Rev. Stat. § 13-80-103.8(1)(d) because it is a "civil action[] brought pursuant to article 17 of title 18." *Response* [#39] at 11-12 (citing *Tilton v. Amen Corner LLC*, No. 2022CV32318 (Colo. Dist. Ct., Arapahoe County, Dec. 19, 2023) (attached as [#39-1]); *Goodwin v. Bruggeman-Hatch*, No. 13-cv-02973-REB-MEH, 2014 WL 4723882, at *5 (D. Colo. July

24, 2014), *report and recommendation adopted in part and rejected in part*, 2014 WL
4723916 (D. Colo. Sept. 22, 2014); *Clementson v. Countrywide Fin. Corp.*, 464 F. App'x
706, 712 n.2 (10th Cir. 2012)).

The Court has reviewed both parties' cited authority and finds that Defendant has
the better argument. Plaintiff's three cited cases apply the five-year limitations period from
Colo. Rev. Stat. § 13-80-103.8(1)(d), but they do so without discussion or explanation.
*See Tilton* [#39-1] at 2 ("COCCA has a five-year limitation. *See* C.R.S. § 13-80-
103.8(1)(d)"); *Goodwin*, 2014 WL 4723882, at *5 (stating that the plaintiff's COCCA claims
"are governed by a five-year statute of limitations, Colo. Rev. Stat. § 13-80-103.8(1)(d).");
*Clementson*, 464 F. App'x at 712 n.2 ("Except for his COCCA claim for which a five-year
statute of limitations applied, *see* Colo. Rev. Stat. § 13-80-103.8(1)(d), (2), [the plaintiff's]
claims were subject to two- or three-year statutes of limitation[.]"). However, these cases
did not require analysis of this issue[5] and, therefore, they have minimal persuasive value.

On the other hand, *RMCO Holdings* engaged in a detailed and in-depth analysis
of the issue and surveyed relevant authority (including *Goodwin* and *Clementson*) before
concluding that Colorado's catch-all two-year statute of limitations in Colo. Rev. Stat. §
103-80-102(1)(i) applied. *See* 2023 WL 3815069, at *9-14. Looking to a published
Colorado district court opinion, the court noted "three reasons why a two-year statute of

---

[5] In *Goodwin*, the court found the COCCA claims were barred even under the longer limitations
period. *Cf. Goodwin*, 2014 WL 4723882, at *6 (finding that the plaintiff "has not sufficiently alleged
any predicate acts that occurred within the statutes of limitations for his COCCA and RICO
claims"). In *Clementson*, the plaintiff-appellant had not challenged the district court's application
of a five-year statute of limitations to COCCA. *See Clementson*, 464 F. App'x at 712 ("Mr.
Clementson does not challenge this holding[.]"). Finally, in *Tilton*, the court rejected defendants'
effort to apply a *one-year* statute of limitation and observed that even if the one-year limitations
period were applicable, the defendants had not met their burden of showing "when the [p]laintiff
knew or reasonably should have known the facts underlying their claims." *See* [#39-1] at 2.

limitations should apply: (1) the title of Colo. Rev. Stat. § 13-80-103.8 ('Limitation of civil forfeiture actions related to criminal acts'); (2) a comparison of Colo. Rev. Stat. § 13-80-103.8(1)(d) to other states' COCCA-adjacent laws; and (3) the Colorado Court of Appeals' opinion in *Todd Holding*." *Id.* at *12 (citing *Scolari v. Compass Health Sys.*, No. 2019CV31128, 2021 WL 6752910, at *5 (Colo. Dist. Ct., Larimer County, Dec. 16, 2021)).

The *RMCO Holdings* court found those rationales persuasive, rejecting the same arguments that Plaintiff raises here. *Compare id.* at *13 (rejecting the plaintiffs' argument that "it is 'improper' to rely on the title of Colo. Rev. Stat. § 13-80-103.8 'because the language of the statute is clear and unambiguous'"), *with Response* [#39] at 11-12 (arguing that the Colorado Supreme Court has "rejected" the suggestion that a title could limit the plain meaning of a statute) (citing *Arvada Village Gardens LP v. Garate*, 529 P.3d 105, 108 (Colo. 2023)). This Court finds *RMCO Holdings*' discussion of *Scolari* and its survey of relevant Colorado statutory interpretation tools well-reasoned and persuasive.

Finally, *RMCO Holdings* noted that the Colorado Court of Appeals' decision in *Todd Holding* necessarily, albeit implicitly, rejected Colo. Rev. Stat. § 13-80-103.8's applicability to COCCA claims. In *Todd Holding*, the court held that "no specific statute of limitations is applicable" to COCCA claims, even though Colo. Rev. Stat. § 13-80-103.8 had been enacted three years prior. *Cf. Todd Holding*, 874 P.2d at 405. In doing so, it distinguished another case that "applied a specific statute of limitations for forfeiture actions." *Id.* This necessarily suggests that the forfeiture statute of limitations does not apply to COCCA claims, placing those claims within the ambit of Colo. Rev. Stat. § 13-80-102(1)(i), which sets a two-year statute of limitations for "[a]ll other actions of every kind for which no other period of limitation is provided." *Accord RMCO Holdings*, 2023

WL 3815069, at *14 (holding that "Colorado's two-year catchall statute of limitations under Colo. Rev. Stat. § 13-80-102(1)(i) applies to [the p]laintiffs' COCCA claims").

Finally, Plaintiff argues that his COCCA claim fits under § 13-80-103.8(1)(d) because he is seeking "forfeiture for the amount of Defendant's proceeds derived from the pattern of racketeering activity." *Response* [#39] at 12 (quoting *First Am. Compl.* [#33], ¶ 171). However, Plaintiff offers no authority to support his assertion that, by seeking equitable relief in the form of restitution or unjust enrichment, he can transform his COCCA claim into a "civil forfeiture" case governed by a different, longer statute of limitations. A party's failure to cite relevant authority "suggests either that there is no authority to sustain its position or that it expects the court to do its research." *Rapid Transit Lines, Inc. v. Wichita Devs., Inc.*, 435 F.2d 850, 852 (10th Cir. 1970). The Court declines to do Plaintiff's research.

Thus, the Court joins *RMCO Holdings* and *Scolari* in finding that a two-year statute of limitations applies. Plaintiff's First Amended Complaint [#33] plainly shows that he did not file suit within two years—he left St. Regis Aspen on July 9, 2021, but he did not file suit until October 20, 2023. *See First Am. Compl.* [#33], ¶ 131; *Compl.* [#4] at 2 (court-stamped by the Pitkin County District Court). Plaintiff's COCCA claim is therefore subject to dismissal under Rule 12(b)(6) and, because it is time-barred, amendment would be futile. *Cf. Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018) (stating that dismissal on the pleadings based on an affirmative defense is appropriate "when the complaint itself admits all the elements of the affirmative defense by alleging the factual basis for those elements") (citations omitted). Accordingly, the Court **recommends** that the Motion [#36] be **granted** as to Plaintiff's Claim Three (COCCA) and that Claim Three

be **dismissed with prejudice** as barred by the statute of limitations. *Cf. Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006) ("A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile.") (citation omitted).

    2.    **RICO**

"RICO vests a private citizen with substantive rights to avoid 'injur[ies]' to 'his business or property' caused by a pattern of racketeering activity, and it explicitly creates a federal cause of action to vindicate those federal rights." *Safe Sts. All. v. Hickenlooper*, 859 F.3d 865, 881 (10th Cir. 2017) (citing 18 U.S.C. § 1964(c)). A RICO plaintiff must allege and ultimately prove (1) that the defendant violated the substantive RICO statute, 18 U.S.C. § 1962; (2) that the plaintiff's business or property was injured; and (3) causation. *Id.* (citing *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 329-31 (2016)). To state a violation of the substantive RICO statute, the plaintiff must "set[] forth 'four elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Deck v. Engineered Laminates*, 349 F.3d 1253, 1256-57 (10th Cir. 2003) (quoting *Robbins v. Wilkie*, 300 F.3d 1208, 1210 (10th Cir. 2002)) (internal quotations omitted).

Here, Defendant argues that Plaintiff has not plausibly alleged that an enterprise existed or that Defendant engaged in any unlawful predicate acts. *See Motion* [#36] at 19-20. The definition of "enterprise" under RICO is similar to that of a "venture" under the TVPA: it "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]" 18 U.S.C. § 1961(4) (defining "enterprise").

In *Boyle v. United States*, the Supreme Court clarified that an association-in-fact enterprise must have three structural features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." 556 U.S. 938, 946 (2009). It need not have a hierarchical structure or chain of command. *Id.* at 948. Additionally, a defendant need not bear primary responsibility for the enterprise's affairs, have a formal position in the enterprise, or even exert significant control over the enterprise to face RICO liability. *Cf. Safe Sts. All.*, 859 F.3d at 883 (citing *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1251 (10th Cir. 2016)). A plaintiff need only plausibly allege that "the enterprise member played some part—even a bit part—in conducting the enterprise's affairs." *Id.* at 884 (quoting *George*, 833 F.3d at 1252).

To state a *pattern* of racketeering activity, the plaintiff must identify at least two "predicate acts" within a ten-year period. *See* 18 U.S.C. § 1961(5) (defining a "pattern of racketeering activity" as "requir[ing] at least two acts of racketeering activity . . . within ten years").

Just as Plaintiff has plausibly alleged a "venture" between Defendant and Alliance, he has plausibly alleged an "enterprise" for RICO purposes. *See First Am. Compl.* [#33], ¶ 190 (alleging an enterprise "including Defendant, Alliance[] [Plaintiff's J-1 visa sponsor], and any other J-1 visa sponsor that sponsored any member of the proposed class"). Specifically, he alleges that "Defendant works with visa sponsors, including [Alliance], in order to recruit and obtain labor for the St. Regis Aspen and other hotels and resorts owned and/or operated by Defendant." *Id.*, ¶ 31. He does not say how long this enterprise existed, but he alleges that there were other J-1 visa interns performing ordinary labor at

the St. Regis, which plausibly suggests ongoing organization between Defendant and J-1 visa sponsors like Alliance. *See, e.g.*, *id.*, ¶¶ 95 (alleging that Plaintiff was housed with "other J-1 interns that worked for St. Regis"), 115 (discussing one "other J-1 culinary intern"), 141 (discussing other J-1 interns who were promised front-desk jobs). Agents for both Defendant and Alliance signed Plaintiff's Internship Plan, suggesting that the two entities "function as a continuing unit" for purposes of placing J-1 interns in positions at the St. Regis Aspen. *Boyle*, 556 U.S. at 945. Plaintiff's allegations that an enterprise exists are not conclusory.

Plaintiff has also plausibly alleged that the enterprise engaged in multiple predicate acts, namely trafficking and forced labor in violation of the TVPA. *Cf. Ross*, 325 F. Supp. 3d at 1168-69 (finding that human trafficking and forced labor were predicate acts for purposes of RICO) (citing *Magnifico v. Villanueva*, 783 F. Supp. 2d 1217, 1229 (S.D. Fla. 2011); *Nuñag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F. Supp. 2d 1134, 1146 (C.D. Cal. 2011) (reasoning that forced labor and human trafficking may serve as underlying predicate acts for a RICO claim)). The Court has found that Plaintiff plausibly alleged Defendant's participation in forced labor through venture liability, and he has alleged that other J-1 interns were subjected to the same housing and working conditions. *See First Am. Compl.* [#33], ¶¶ 95, 115, 141. This plausibly suggests at least two predicate acts of trafficking and forced labor.

Additionally, and alternatively, Plaintiff has plausibly alleged that Defendant engaged in another predicate act in the form of wire (or mail) fraud, by submitting J-1 visa forms to the State Department that contained false information about the work Plaintiff would actually perform and failing to inform the government that his actual employment

was not in compliance with J-1 visa requirements. *See, e.g.*, *United States v. Deguzman*, 133 F. App'x 501, 506-07 (10th Cir. 2005) (sustaining defendant's wire fraud conviction for, *inter alia*, "submitt[ing] visa applications to the INS [Immigration and Nationalization Services] under oath which contained false information about . . . the jobs for which the men were being authorized entry" and "fail[ing] to properly inform the INS that their actual employment was not in compliance with the requirements of their H-1B visas"); *First Am. Compl.* [#33], ¶¶ 18, 20-22 (alleging that Defendant provided Plaintiff's Internship Plan to the State Department and did not ultimately follow through with the promised internships).

For these reasons, the Court is not persuaded by Defendant's arguments as to the "enterprise" or "pattern" elements of Plaintiff's RICO claim. Defendant does not challenge the other elements, and the Court finds that Plaintiff has plausibly alleged a RICO claim based on predicate acts of wire fraud and forced labor under the TVPA. Therefore, the Court **recommends** that the Motion [#36] be **denied** as to Claim Six (RICO).

### IV. Conclusion

Based on the foregoing,

IT IS HEREBY **RECOMMENDED** that the Motion [#36] be **GRANTED IN PART** and **DENIED IN PART**.

IT IS FURTHER **RECOMMENDED** that Plaintiff's Claim One and Claim Two (CCPA) be **DISMISSED WITHOUT PREJUDICE** for failure to state a claim.

IT IS FURTHER **RECOMMENDED** that Plaintiff's Claim Three (COCCA) be **DISMISSED WITH PREJUDICE** as barred by the statute of limitations.

IT IS FURTHER **RECOMMENDED** that Plaintiff's Claims Four (Colorado Human Trafficking Statute), Five (TVPA), and Six (RICO) be permitted to proceed.

IT IS FURTHER **ORDERED** that any party may file objections **within 14 days** of service of this Recommendation. In relevant part, Fed. R. Civ. P. 72(b)(2) provides that, "within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. 2121 E. 30th St.*, 73 F.3d 1057, 1060 (10th Cir. 1996). The objection must be "sufficiently specific to focus the district court's attention on the factual and legal issues that are truly in dispute." *Id.* "[A] party who fails to make a timely objection to the magistrate judge's findings and recommendations waives appellate review of both factual and legal questions." *Morales-Fernandez v. I.N.S.*, 418 F.3d 1116, 1119 (10th Cir. 2005).

Dated: February 27, 2025          BY THE COURT:

Kathryn A. Starnella
United States Magistrate Judge