**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Case No. 1:23-cv-03308-RMR-KMS

DANIEL ESTEBAN CAMAS LOPEZ,
individually and on behalf of all similarly
situated persons,

      Plaintiff,

v.

MARRIOTT INTERNATIONAL, INC.,

      Defendant.

---

**DEFENDANT MARRIOTT INTERNATIONAL, INC.'S
OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

---

**ORAL ARGUMENT REQUESTED**

DLA PIPER LLP (US)

*/s/ Michael P. O'Day*
Michael P. O'Day
Ellen E. Dew
William W. Reichart III

DLA PIPER LLP (US)
650 S. Exeter St.
Suite 1100
Baltimore, MD 21202
Tel.: (410) 580-3000
Fax: (410) 580-3001
michael.oday@us.dlapiper.com
ellen.dew@us.dlapiper.com
wes.reichart@us.dlapiper.com

*Counsel for Defendant Marriott International, Inc.*

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 4

I.   J-1s Have Individualized Experiences and Training at the Hotel ............................... 4

    A.  J-1 Visa Training / Internship Programs .............................................................. 4

    B.  The Hotel Hosts J-1s from Around the World. ...................................................... 5

    C.  Department Managers Make Individualized Hiring Decisions for J-1s.................. 5

    D.  J-1s Train at the Hotel Under Unique, Individualized Training Plans.................... 6

    E.  J-1s Are Paid Based on their Experience and Hours Trained. ............................. 6

    F.  J-1s Praise Their Programs and Experiences at the Hotel. .................................. 7

II.  Plaintiff's Unique Experience at the Hotel ................................................................. 8

    A.  Plaintiff Came to the Hotel After His Prior Internship Ended................................. 8

    B.  Plaintiff's Training at the Hotel Fully Complied with His Plan............................... 9

    C.  Plaintiff Voluntarily Quit to Work at an Understaffed Hotel. ............................... 10

    D.  Plaintiff Was Satisfied with Alliance's Assistance. .............................................. 11

    E.  Plaintiff Files This Lawsuit After Responding to an Attorney Ad. ....................... 11

LEGAL STANDARD...................................................................................................... 12

I.   Plaintiff Must Affirmatively Prove that His Claims Satisfy Rule 23............................ 12

II.  The Court Must Undertake a Rigorous Analysis of the Evidence. ........................... 12

ARGUMENT.................................................................................................................. 13

I.   Individualized Issues, Not Common Questions, Will Predominate........................... 13

    A.  Forced Labor Requires Individualized Proof of an Unlawful Act that Caused
       Plaintiff to Unwillingly Provide Labor.................................................................. 14

    B.  Individualized Trials are Required for Each J1 on Each Element. ....................... 14

       1.  Individualized Evidence is Required to Prove Coercion. ............................... 14

       2.  Individualized Evidence is Required to Prove Causation. .............................. 17

C. The Venture Liability Theory is Also Individualized............................................... 20

D. The RICO Claim is Also Individualized. ............................................................. 21

II. A Class Action is Not Superior in this Case. ............................................................. 23

III. Plaintiff Has Not Established Commonality, Typicality, or Adequacy. ...................... 24

CONCLUSION ............................................................................................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alvarado v. Universidad Carlos Albizu*,
  2010 WL 3385345 (S.D. Fla. Aug. 25, 2010) ........................................................ 15

*Anwar v. Fairfield*,
  289 F.R.D. 105 (S.D.N.Y. 2013) ........................................................................... 24

*Barrientos v. CoreCivic, Inc.*,
  2023 WL 2666852 (M.D. Ga. Mar. 28, 2023) ............................................. 17, 19, 20

*Bixler v. Foster*,
  596 F.3d 751 (10th Cir. 2010) .............................................................................. 21

*Brayman v. KeyPoint Govt. Sols., Inc.*,
  83 F.4th 823 (10th Cir. 2023) ......................................................................... 13, 24

*Carlson v. Town of Mountain Vill.*,
  2019 WL 1331977 (D. Colo. Mar. 25, 2019) ......................................................... 21

*Carter v. Paschall Truck Lines, Inc.*,
  2023 WL 359559 (W.D. Ky. Jan. 23, 2023) ........................................................... 14

*CGC Holding, LLC v. Broad and Cassel*,
  773 F.3d 1076 (10th Cir. 2014) ............................................................................ 13

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ............................................................................................... 12

*David v. Signal Intern., LLC*,
  2012 WL 10759668 (E.D. La. Jan. 4, 2012) ....................................................*passim*

*Dumapias v. Haybryne*,
  2020 WL 9260247 (E.D. Va. Nov. 2, 2020) ........................................................... 15

*Dummar v. Lummis*,
  543 F.3d 614 (10th Cir. 2008) .............................................................................. 21

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ............................................................................................. 13

*Francis v. APEX USA, Inc.*,
  2021 WL 4487985 (W.D. Okla. Sept. 30, 2021) ...............................................*passim*

*Hemi Grp., LLC v. City of New York*,
    559 U.S. 1 (2010) ................................................................................................ 22

*Hill v. Aspen Contracting, Inc.*,
    2021 WL 2662296 (D.N.M. Feb. 22, 2021) ........................................................ 12

*Kang v. POSCO AAPC LLC*,
    2025 WL 1078764 (S.D. Ind. Apr. 9, 2025) ........................................................ 15

*Menocal v. GEO Grp., Inc.*,
    882 F.3d 905 (10th Cir. 2018) ..................................................................... 14, 20

*Muchira v. Al-Rawaf*,
    850 F.3d 605 (4th Cir. 2017) .............................................................................. 15

*Panwar v. Access Therapies, Inc.*,
    2015 WL 329013 (S.D. Ind. Jan. 22, 2015) ........................................................ 25

*Roe v. Bridgestone Corp.*,
    257 F.R.D. 159 (S.D. Ind. 2009) ................................................................... 16, 24

*Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.*,
    319 F.3d 205 (5th Cir. 2003) .............................................................................. 22

*Trevizo v. Adams*,
    455 F.3d 1155 (10th Cir. 2006) ................................................................... 13, 25

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ............................................................................................ 13

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) ............................................................................... 24

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ..................................................................................... 12, 24

*Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*,
    725 F.3d 1213 (10th Cir. 2013) ................................................................ *passim*

**Statutes**

C.R.S. § 18–3–502(2) ............................................................................................ 14

C.R.S. § 18–3–503 ................................................................................................. 14

18 U.S.C. § 1589(b) ............................................................................................... 20

18 U.S.C. § 1589(c)(1) .................................................................................... 15, 17

18 U.S.C. § 1589(c)(2) ............................................................................. 18, 19

18 U.S.C. § 1961(5) ....................................................................................... 22

**Regulations**

22 C.F.R. § 62.........................................................................................*passim*

71 F.R. 17768–01 (2006) ............................................................................... 15

72 F.R. 33669-01 (2007) ............................................................................... 16

**Rules**

Fed. R. Civ. P. 23....................................................................................*passim*

## INTRODUCTION

This case is about Plaintiff's subjective dissatisfaction with his six-week culinary internship at the St. Regis Aspen Resort (the "Hotel") in the summer of 2021. Despite asserting forced labor claims which require Plaintiff to show that he was coerced into working at the Hotel, Plaintiff now admits that he was never threatened or coerced by anyone. Nor has he identified a single task he was asked to perform that did not comply with his Training/Internship Placement Plan ("Plan"). Instead, the evidence shows that Plaintiff freely quit his internship *before* ever raising a concern with his visa sponsor or the Hotel, but *after* securing a position at another hotel promising him higher pay and a sign-on bonus because it was understaffed. Given these facts, Plaintiff has no basis to assert a forced labor or racketeering claim, much less on behalf of all J-1 trainees and interns ("J-1s") at the Hotel over the past nine years. That is particularly true given that other J-1s during the asserted class period have put forth sworn declarations giving glowing reviews of their time at the Hotel, citing the meaningful training they received under their individualized programs, and confirming they do not share Plaintiff's subjective beliefs that the program treated them as "ordinary labor." A brief preview shows just that:

- A J-1 intern says her experience has been: "'amazing." "I have greatly enjoyed interacting with guests and learning more about luxury service. These were my goals going into the experience and I feel like I have achieved them." Alvardo Decl. ¶¶ 53, 55.[1]

- A J-1 intern says the program has been "a great experience. The people of the St. Regis Aspen Resort have the best hospitality. I would do this program all over again if I could." Kapoor Decl. ¶ 59.

- A former J-1 trainee says the program was "a great opportunity" and he enjoyed it so much he "ultimately followed [his] dream of returning to the St. Regis Aspen Resort as a pastry chef when a position opened." Samad Decl. ¶¶ 10, 12.

---

[1] All citations to the Declarations are in this format: [Name] Decl. at ¶ __.

1

- A J-1 intern says the program was "great" and she has "learned a lot" including in her special interest in "pastries, and about American culture." Saraswatula Decl. ¶ 66.

Conversely, despite his evidentiary burden, Plaintiff's Motion fails to introduce any evidence that a *single* other J-1 shared *his* experience. Not only has discovery discredited Plaintiff's allegations, but it has also confirmed what was clear at the outset—Plaintiff's claims cannot be certified as a class action. That's because they rely on individualized circumstances regarding *Plaintiff's* training and interactions with *his* sponsor and the Hotel. Indeed, the court in *Francis v. APEX USA, Inc.*, the case this Court found particularly persuasive at the motion to dismiss stage, reached the same conclusion and denied class certification. 2021 WL 4487985 (W.D. Okla. Sept. 30, 2021).  As in *Francis*, here, Plaintiff cannot stand in for all J-1s and prove their (non-existent) "claims" with common evidence.

Faced with this reality, Plaintiff's Motion ignores the evidence and the law and attempts to manufacture a new, legally unsupported theory of forced labor: that Plaintiff's internship was "used to fill ordinary employment needs" in violation of his Plan and the regulations governing J-1 visa internships. Mot. at 1.  Setting aside that this theory is not legally viable, it too cannot be certified as a class action because it is based entirely on *individualized evidence*, including *Plaintiff's subjective beliefs*: (1) that he performed tasks that any hourly worker could perform; (2) that his work-based training was ordinary labor; (3) that the Hotel was understaffed during his six-week internship; and (4) that he did not receive all the training referenced in his internship plan.

Under either theory, a class cannot be certified because, at a minimum, the elements necessary to establish a forced labor claim require the Court to undertake the following case-by-case analysis for each putative class member:

2

- An evaluation of the disparate tasks actually performed by each J-1 across a multitude of departments and whether each task constituted "ordinary employment" under the J-1 visa regulations;

- A review of the hours trained by each J-1, whether those hours were requested for additional training, and any time-off requests;

- Review of the content of each unique Training/Internship Placement Plan ("Plan") and testimonial evidence of adherence to the Plan from hundreds of witnesses;

- The level of staffing[2] in each department at the Hotel at the time the task was performed and whether the J-1 displaced any local hourly workers;

- Whether the J-1 was unlawfully coerced into completing work-based training at the Hotel by means of a statutorily enumerated act;

- Whether, based on their unique circumstances, any alleged coercion caused the J-1 to complete work-based training at the Hotel when they otherwise would have quit; and

- Whether the J-1 was injured.

This analysis would require a litany of mini-trials. For just one class member, the Court would need to undertake a review of that J-1's unique Plan and hear testimony from at least a half-dozen witnesses (many of whom are now all over the world) including the J-1, J-1's supervisors, managers, sponsor, and colleagues concerning the factual issues identified above. There is not common evidence available because J-1s had different plans, trained in different departments, performed different tasks, reported to different supervisors, and trained different hours. As such, the forced labor claims cannot possibly be litigated on a class basis. Courts across the country have come to the same conclusion in similar cases (including district courts within the Tenth Circuit such as in *Francis*).

Similarly, Plaintiff's civil RICO claim cannot be certified because it is based on alleged fraudulent statements in his Plan about *his* experience. Whether or not those

---

[2] Despite making conclusory assertions that the Hotel was "understaffed" during his internship, Plaintiff has not put forward any evidence on the appropriate staffing level for the Hotel at any other time, much less if it was "sufficient."

statements were true for any J-1, requires the same individualized fact-finding regarding their unique experience. Moreover, courts have made clear that individualized issues of reliance and causation also preclude certification of the RICO claim even where, as here, a class plaintiff tries to advance a fraud on the government theory. *See David v. Signal Intern., LLC*, 2012 WL 10759668 (E.D. La. Jan. 4, 2012) (denying class certification).

In sum, Plaintiff has not and cannot meet his "strict burden of proof" to establish any of the requirements for class certification, much less all of them. *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1217 (10th Cir. 2013).

## FACTUAL BACKGROUND

### I.    J-1s Have Individualized Experiences and Training at the Hotel

### A.    J-1 Visa Training / Internship Programs

The U.S. Department of State administers and regulates the J-1 Visa Program, by, among other things, designating entities to act as "Sponsors" for exchange visitors and strictly overseeing the Sponsors' individual programs. *See* 22 C.F.R. §§ 62.5–62.15. "Sponsors may engage third parties"—referred to as "Host Organizations"—"to assist them in the conduct of their designated training and internship programs." *Id.* at § 62.22(g); § 62.2. These programs offer "structured and guided work-based learning" for two types of J-1 visa holders (with differing experience levels): "Trainees" and "Interns." *Id.* at § 62.22(b)(1)(i). In order to qualify, both "must have sufficient finances to support themselves for their entire stay in the United States, including housing and living expenses." *Id.* at § 62.22(e)(2).

As part of their respective programs, J-1s train subject to a Plan. *Id.* at § 62.22(i). Sponsors are responsible for completing the Plans, including stating specific goals, the knowledge and skills to be learned, and the methods for evaluation, all of which differ for

trainees and interns. *See id.*

### B.    The Hotel Hosts J-1s from Around the World.

As part of its commitment to developing international talent in the hospitality industry, the Hotel hosts a diverse set of J-1s with unique backgrounds and experiences. Steenge-Hart Decl. ¶ 26. During the class period, J-1s have come to the Hotel from 49 different countries. Escobar Decl. ¶ 28. They have varying levels of experience, ranging from student interns to trainees with more than five years of experience. *Id.* at ¶ 24.

Their paths to the Hotel also varied. Some work with a recruiter, either an independent recruiting agency or one of five different agencies engaged by the Hotel. *Id.* at ¶¶ 48–49. Others apply directly to the Hotel through a "self-arranged application." *Id.* at ¶ 47. And others still, such as Plaintiff, find their way to the Hotel after already coming to the U.S. for a different opportunity. *Id.* Ultimately, J-1s have their visas sponsored by eight different sponsors, each with their own different processes and agreements with their respective participants. *Id.* at ¶¶ 64, 72.

### C.    Department Managers Make Individualized Hiring Decisions for J-1s.

The Hotel hosts J-1s in different departments: (1) Culinary, (2) Food & Beverage, and (3) Front Office/Rooms. *Id.* at ¶ 50. Within each department, J-1s train in different functions and rotate through several different roles. *Id.* at ¶ 51. The varying functions and roles are supervised and managed by different people. *Id.* at ¶ 54. The staff in each department constantly changes as employees enter and exit employment. *Id.* at ¶ 56.

Twice per year the leaders of these departments, along with the Hotel's leaders, analyze several factors to determine the number of J-1s that the Hotel may host. Steenge-Hart Decl. ¶ 113. Among other things, the Hotel forecasts occupancy to ensure there are sufficient opportunities for each J-1 to receive the required minimum of 32 hours of

5

supervised training per week. *Id.* at ¶ 114. Supervised training positions are not available for hourly employees, and J-1s did not work in positions "equivalent" to employees. Ex. 20 (Zemnick Tr. 18:16–21).[3] After determining the number of spots, the Hotel considers and interviews applicants. Escobar Decl. ¶¶ 58–64. Hiring decisions are individualized.

Contrary to the threadbare and conclusory assertions in the Motion, Marriott does not hire J-1s to replace, or serve as a substitute, for local workers, or to perform ordinary labor. Steenge-Hart Decl. ¶ 123. The Motion misrepresents Marriott's testimony, which in full shows that far from staffing the Hotel with as many J-1s as possible, the Hotel sought to hire local workers and actively recruited and hired them. *Id.* at ¶ 128. That J-1s "assisted with the operation of the Hotel" does not render their labor ordinary but highlights the high-level work-based training they engaged in, as opposed to menial tasks. *Id.* at ¶ 116.

## D.    J-1s Train at the Hotel Under Unique, Individualized Training Plans.

A J-1's Plan is tailored to their experience, department, sponsor, and the time period during which they are training at the Hotel. Escobar Decl. ¶¶ 65–90. Plans are developed in collaboration with the J-1, Sponsor, and the Hotel's department heads. *Id.* Given these individualized inputs and circumstances, Plans necessarily differ between J1s. *Id.* Determining whether any individual Plan was followed requires not only an individualized review of that Plan but also individualized fact-finding of the training provided and the work performed by each J1.[4] *Id.*

## E.    J-1s Are Paid Based on their Experience and Hours Trained.

The Hotel sets wage rates based on individual experience level, qualifications,

---

[3] All citations to the Deposition Transcripts are in this format: [Name] Tr. [Page:Line].
[4] Marriott produced for a randomized sample of J-1s: the J-1's Plan, time and pay records, and Marriott's communications with them and their sponsors (including communication regarding hiring and expectations). Notably, Plaintiff ignores this evidence in his Motion.

market factors, and business considerations. *Id.* at ¶¶ 110–21; Ex. 1 (Response to Rog. No. 4). The starting wage available to J-1s in the Food & Beverage and Rooms Departments is the same as for hourly employees in these departments.[5] Escobar Decl. ¶ 115. That said, J-1s with more experience may be paid more. *Id.* at ¶ 118; Samad Decl. ¶ 21. An individualized review of records and testimony is required to determine the wages paid to any specific J-1 and the reasons for any differences.

Training schedules for J-1s are set on a weekly basis by the Hotel's departments based on available training opportunities, which in turn depend on variable business factors. Escobar Decl. ¶¶ 127–40. For example, there may be a week where the Hotel is hosting a large group with a formal banquet that would allow for additional training opportunities in the Culinary and Food & Beverage departments. Pursuant to the J-1 regulations, the Hotel guarantees J-1s at least 32 hours per week. *Id.* at ¶ 132. However, at any given time, J-1s had different schedules for different training with varying hours.

The number of hours trained by a J-1 varies based on individual preferences and goals. J-1s often seek out opportunities beyond their scheduled training. Samad Decl. ¶ 37; Saraswatula Decl. ¶ 44; Alvardao Decl. ¶ 35; Kappor Decl. ¶ 38; Escobar Decl. ¶¶ 135–36. All overtime training is optional and paid at 1.5 times the hourly rate. *Id.* at ¶ 137.

### F.    J-1s Praise Their Programs and Experiences at the Hotel.

Marriott dedicates significant resources to hosting J-1s for training and internship programs at the Hotel. Managers and supervisors provide meaningful training and feedback to J-1s. Samad Decl. ¶ 29; Saraswatula Decl. ¶ 31; Alvardao Decl. ¶ 23; Kapoor

---

[5] Given the skill-level difference between new interns and experienced chefs, the starting wage available to J-1 interns in the Culinary Department was a few dollars less than for hourly employees, but the same as the starting rate for U.S. interns. Escobar Decl. ¶ 116.

Decl. ¶ 21. The Hotel also provides a unique package of benefits for J1s (such as subsidized housing and transportation, and a free ski pass), and hosts dozens of formal and informal cultural activities each year. Escobar Decl. ¶¶ 141–48. J-1 trainees and interns are free to participate in these activities should they wish to do so, and participation varies based on personal preferences. *Id.*

J-1s have referred to it as a "privilege" to have participated in the program with glowing reviews of their different experiences. Ex. 21. These participants categorically reject any suggestion that their experience could be categorized as "ordinary labor," much less that they were forced to perform any work at the Hotel against their will. Samad Decl. ¶ 72; Saraswatula Decl. ¶ 63; Alvardao Decl. ¶ 51; Kapoor Decl. ¶ 57. These participants, including J-1s in the Culinary Department, received meaningful training as outlined in their Plans, participated in cultural activities, shared in cultural exchange with others at the Hotel, had financial resources to participate in the program, and were happy with how the program met their individual expectations and unique goals. Samad Decl. ¶ 13; Saraswatula Decl. ¶ 18; Alvardao Decl. ¶ 8; Kapoor Decl. ¶ 11. Plaintiff's alleged treatment and expectations are not representative of theirs.

As a further testament to the program's success, participants often seek employment at other Marriott properties after the J-1 program ends. Samad Decl. ¶ 12. And there are J-1s that have made it their career goal to return to the Hotel. *Id.*

## II.    Plaintiff's Unique Experience at the Hotel

### A.    Plaintiff Came to the Hotel After His Prior Internship Ended.

Unlike most other participants, Plaintiff came to the Hotel only after his internship at another hotel in Aspen prematurely ended. He was not recruited to work at the Hotel by Marriott. Rather, he learned of the J-1 Visa Program through a company in Mexico,

8

Ex. 22 (Camas Tr. 26:3–7), and he then worked with that company to locate a J-1 visa Sponsor-Alliance Abroad Group ("Alliance") *Id.* at 27:25–28:6.

Plaintiff's first internship was terminated by the Snowmass Resort because that hotel was closed for renovations. *Id.* at 20:22–25. He sought to interview with the Hotel based on a recommendation from a former J-1 that interned in the Hotel's culinary department. Ex. 23 (Camas Rog. Response No. 11). He interviewed, was considered by department leadership, and accepted a position on April 5, 2021. Ex. 24.[6]

Notably, far from relying on any language in his Plan in deciding whether to accept the position, Plaintiff's Plan was not even drafted at that time, much less reviewed by him. Law Decl. ¶ 68, Ex. 14. Only after he accepted the position did the Hotel work with Alliance to develop Plaintiff's Plan based on Alliance's preferred plans, Plaintiff's work at the prior hotel, and the time remaining on his J-1 visa. *Id.*

**B.    Plaintiff's Training at the Hotel Fully Complied with His Plan.**

During his six weeks at the Hotel, Plaintiff was given meaningful work-based training opportunities in the Hotel's culinary department. He observed the chefs, asked questions, and was provided feedback on how to make the Hotel's signature recipes, plate dishes, and operate in a high-end kitchen. Ex. 22 (Camas Tr. 108:6–109:3). Plaintiff had never prepared food like this before, and there was never a time when other chefs refused to answer his questions. *Id.* Although Plaintiff did not perform all the training in his Plan (because he quit during phase 2 of 5), he has not identified a single task he performed that was not listed in his Plan.

---

[6] Plaintiff originally declined the Hotel's offer of subsidized housing. Ex. 25. However, after being unable to find a better option, he decided to lease housing from the Hotel knowing its price, location, and that he would have a roommate. *Id.*

Additionally, while Plaintiff claims he subjectively felt like he was used to fill "ordinary employment needs," he cannot identify any non-J-1s that were unable to secure employment at the Hotel due to his work in the culinary department. *Id.* at 70:10–13; 18–20. The Culinary Department was actively hiring U.S. workers during his short stint at the Hotel. *Id.* at 150:1–10. And there were only 2 J-1s working in the kitchen—everyone else was a domestic worker or intern. *Id.* at 107:2–5. Moreover, Plaintiff does not claim that he was required to perform all of the various tasks of those workers or other tasks that hourly workers are required to do.

Although Plaintiff alleges dissatisfaction with his scheduled hours, he never asked not to train overtime, for which he was fully compensated. *Id.* at 116:1–3. And he took multiple sick days. *Id.* at 114:16–19. According to Plaintiff, the hourly (non-J-1) workers in the culinary department worked more hours than he did during the same time period. *Id.* at 188:12–14.

### C.    Plaintiff Voluntarily Quit to Work at an Understaffed Hotel.

As part of his Plan, Plaintiff understood that he had an obligation to contact his Sponsor "at [the] earliest available opportunity" regarding "any concerns, changes, or deviations" from the Plan. *Id.* at 86:21–87:6. After the first 2 weeks, Plaintiff asked Alliance about extending his internship at the Hotel for additional months. Law Decl. ¶ 70. Twice during his internship when Alliance asked him for feedback (on May 24, 2021, and June 16, 2021) he reported that his "[t]raining plan was on track." *Id.* at ¶¶ 74–75, Exs. 16 &17.

Plaintiff did not raise any concerns with Alliance until June 25, 2021, at which time he informed Alliance that he wished to transfer to a new hotel. *Id.* at ¶ 76. Days earlier, Plaintiff had been recruited by another hotel in Aspen (the Viceroy) which needed culinary help because it was, by its own admission, "understaffed." Ex. 18; Ex. 26. The Viceroy's

executive chef told Plaintiff "that he needed [him]," offering a $500 sign-on bonus and higher wage. Ex. 22 (Camas Tr. at 140:13–17). Despite the fact that the Viceroy required more work (as Plaintiff explained "40 hour weeks minimum"), he chose to switch. Ex. 18.

**D.    Plaintiff Was Satisfied with Alliance's Assistance.**

Far from coercing Plaintiff to stay at the Hotel or threatening him with deportation (the allegations that allowed Plaintiff to avoid dismissal of this case), Plaintiff admitted that Alliance assisted him with the transfer process. Ex. 22 (Camas Tr. 164:12–18). Once Plaintiff notified Alliance of his decision to transfer, Alliance reiterated that it would "do all that we can to support you during this program" and that "[t]here are processes in place for transferring to a new Host Company." Ex. 18. Plaintiff gave his 2-weeks' notice and left the Hotel without incident. The then Human Resources Director, Darren Zemnick, never threatened him. Ex. 20 (Zemnick Tr. 58:22–59:2); Ex. 22 (Camas Tr. 166:3–9).

**E.    Plaintiff Files This Lawsuit After Responding to an Attorney Ad.**

No one else has ever advanced the allegations Plaintiff makes here. Steenge-Hart Decl. ¶¶ 183–95; Escobar Decl. ¶ 183–95; Law Decl. ¶ 98–108; Lemire Decl. ¶ 31–40. Plaintiff completed his J-1 program and never raised any concerns with the State Department. He has since established a career at the Viceroy, where he manages the culinary department, including J-1s who make up 1/3 of his workforce at any given time, and who are assigned to work overtime. Ex. 22 (Camas Tr. 13:23–15:6).

Plaintiff filed this lawsuit after responding to an attorney advertisement seeking plaintiffs to bring class actions against companies that host J-1s. *Id.* at 172:17–173:15. Plaintiff asserted several causes of action and three survived dismissal: forced labor trafficking under the federal Trafficking Victims Protection Reauthorization Act ("TVPRA") and Colorado Human Trafficking Statute, and for damages under the federal Racketeer

Influenced Corrupt Organizations Act ("RICO"). Ultimately, Plaintiff moves to certify a class of 362 individual J-1s over nine years, citing no evidence from or about any of them.

## **LEGAL STANDARD**

### I.    **Plaintiff Must Affirmatively Prove that His Claims Satisfy Rule 23.**

Recognizing that he cannot possibly satisfy the standard for class certification under Rule 23, Plaintiff invites this Court to commit reversible error by urging the Court to grant certification even in a "doubtful case." *See* Mot. at 13. As the Tenth Circuit explained in *Rodericks*, district courts err when applying a "less demanding standard whereby class certification requirements are liberally construed" and "resolv[ing] doubts in favor of certification." 725 F.3d at 1218. This is because "'[t]he class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Id.* at 1217 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011)).

For a class to be certified, Plaintiff "must affirmatively demonstrate his compliance" with Rule 23 by proving "*in fact*" that all prerequisites are satisfied. *Id.* (quoting *Wal-Mart*, 564 U.S. at 348). This requires "'evidentiary proof'" because "Rule 23 is more than a pleading standard." *Id.* (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)).

### II.    **The Court Must Undertake a Rigorous Analysis of the Evidence.**

The Court "must independently find the relevant facts…" *Hill v. Aspen Contracting, Inc.*, 2021 WL 2662296, at *2 (D.N.M. Feb. 22, 2021). As the Tenth Circuit has explained, "the district court has an independent obligation to conduct a '***rigorous analysis***' before concluding that Rule 23's requirements have been satisfied." *Roderick*, 725 F.3d at 1217 (emphasis added) (quoting *Wal-Mart*, 564 U.S. at 348) (vacating certification order where the district court failed to rigorously analyze the evidence and failed to enforce Rule 23's "strict burden of proof" on the party seeking certification). The Court must "understand the

12

claims, defenses, relevant facts, and applicable substantive law to make a meaningful determination of the certification issues." *David*, 2012 WL 10759668, at *15. If Plaintiff fails to prove by a preponderance of the evidence even one of Rule 23's requirements, his Motion must be denied. *Trevizo v. Adams*, 455 F.3d 1155, 1163 (10th Cir. 2006).

## **ARGUMENT**

### I.     **Individualized Issues, Not Common Questions, Will Predominate.**

Courts often start with Rule 23(b)(3)'s predominance requirement because it "regularly presents the greatest obstacle to class certification." *CGC Holding, LLC v. Broad and Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014). Meeting it "requires the court to find that…'questions of law or fact common to class members predominate over any questions affecting only individual members.'" *Roderick*, 725 F.3d at 1217 (quoting Fed. R. Civ. P. 23(b)(3)); *Brayman v. KeyPoint Govt. Sols., Inc.*, 83 F.4th 823 (10th Cir. 2023).[7]

The predominance analysis "begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). After identifying the elements, the Tenth Circuit instructs that "[t]he district court should carefully examine what facts are required to prove Plaintiffs' claims and then determine whether Plaintiffs have shown that they ***could establish those facts through common evidence***." *Brayman*, 83 F.4th at 839 (emphasis added). This "requires more" than merely reviewing the plaintiff's contentions, including that defendant's "unlawful policies are common to the class." *Id.* (vacating certification order). Rather, the Court must consider the actual available sources of proof that could establish the claims. *Id.* Here, those

---

[7] Common issues are those "where the same evidence will suffice for each [class] member to make a prima facie showing" of their claim, whereas individual issues require class members "to present evidence that varies from member to member." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).

sources are individualized, including unique documentary and testimonial evidence. *See* O'Day Decl. Ex. 27 (Summary Chart of Evidence).

> **A.    Forced Labor Requires Individualized Proof of an Unlawful Act that Caused Plaintiff to Unwillingly Provide Labor.**

The TVPRA prohibits "knowingly…obtain[ing] the labor or services of a person" through certain statutorily enumerated means of coercion. 18 U.S.C. § 1589. The Colorado Human Trafficking Statute includes materially the same prohibitions. C.R.S. § 18–3–503. To prove coercion necessary for a forced labor claim, Plaintiff must show that "an unlawful means of coercion *caused*" him "to render labor" that he otherwise would not have provided. *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 918 (10th Cir. 2018) (emphasis added); *see also Carter v. Paschall Truck Lines, Inc.*, 2023 WL 359559, at *8 (W.D. Ky. Jan. 23, 2023) ("Liability requires a causal link between one or more of the unlawful means enumerated…and the labor actually obtained"). "The question of forced labor turns on whether the defendant's conduct or tactics *reasonably coerced or forced the victim to provide labor.*" *David*, 2012 WL 10759668, at *19 (emphasis added).

> **B.    Individualized Trials are Required for Each J1 on Each Element.**

> **1.    Individualized Evidence is Required to Prove Coercion.**

To avoid dismissal, Plaintiff relied on the following prohibited forms of coercion:

> …(2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of abuse or threatened abuse of the law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589; C.R.S. § 18–3–502(2). For pleading purposes, this Court concluded that alleged "[t]hreats of deportation are sufficient to meet" each form of coercion. ECF No. 65 at 6. However, now recognizing that his allegations have been disproven and that

any alleged threats are necessarily individualized issues of fact, *see Francis*, 2021 WL 4487985, at *3, Plaintiff abandons that theory of coercion for class certification.

Instead, Plaintiff now asserts that Marriott "abused the law" by hosting programs that "did not comply with the legal requirement that [the J-1's] labor not be utilized to fill ordinary labor needs." Mot. at 14. This theory too is misplaced. Courts have confirmed that an alleged violation of a visa regulation alone, even if it could give rise to a cause of action,[8] is insufficient to constitute forced labor. *See Alvarado v. Universidad Carlos Albizu*, 2010 WL 3385345, at *3 (S.D. Fla. Aug. 25, 2010) (violation of a visa regulation alone does not constitute an abuse of the law). Rather, the trafficking law prohibits an "abuse of the law" undertaken "*in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.*" 18 U.S.C. § 1589(c)(1) (emphasis added); *see also Alvarado*, 2010 WL 3385345, at *3 (requires "wield[ing] the regulation as a tool of coercion"); *Muchira v. Al-Rawaf*, 850 F.3d 605, 608 (4th Cir. 2017) (same).[9] Ultimately, whether Marriott violated the regulations with respect to a J-1's experience and whether that violation coerced the J-1 are both individualized issues.

Here, Plaintiff has not put forward class-wide evidence that could establish that Marriott violated the prohibitions on "ordinary labor" with respect to each J-1 in the purported class in order to coerce them. That's because none exists. As the State Department has made clear, "the simple fact that exchange visitors are working does not

---

[8] Private litigants *do not* have a right to enforce the J-1 regulations. *Kang v. POSCO AAPC LLC*, 2025 WL 1078764, at *3 (S.D. Ind. Apr. 9, 2025) (dismissing claim; plaintiff had "not identified a statute, regulation, or other authority creating a private cause of action to sue for [alleged] violations [of 22 C.F.R. § 62], *and the Court has found none*").

[9] The same is true with respect to employment promises. *See Dumapias v. Haybryne*, 2020 WL 9260247, at *12 (E.D. Va. Nov. 2, 2020) (rejecting abuse of law theory based on alleged breaches of certain provisions in employment contract because no coercion).

mean that they are not engaged in training." 71 F.R. 17768–01 (2006). According to the

State Department, distinguishing between permissible work-based training and

impermissible ordinary labor requires a nuanced and individualized analysis of the

activities performed:

> The Department recognizes that work is an essential component of on-the-job training, and that in many respects ***there are no conceptual or legal distinctions between an employee and a trainee***….While a trainee is performing work as a component of his/her training experience, the work is only a part of the learning program that is designed to enhance the trainee's skills in his/her occupational specialty through exposure to American techniques, methodologies, and expertise.

72 F.R. 33669-01 (2007) (emphasis added).

Courts evaluating similar forced labor claims have denied class certification on this

basis. For example, in *Roe v. Bridgestone Corp.*, the court concluded that the claim would

require "different witnesses and proofs for various putative class members to enable the

fact finder to determine, among other things, what labor the individual performed" and

whether that labor, and the circumstances surrounding it, violated the law. 257 F.R.D.

159, 172 (S.D. Ind. 2009) (individualized issues predominated because "[s]eparating

individuals who have actionable claims from those who do not will require individualized

inquiries into each plaintiff's situation and circumstances"). The same is true here. Plaintiff

admitted that the facts supporting his allegation that he was "required to work substantially

as a general kitchen laborer" involve the individual tasks *he* performed as directed by *his*

supervisors in the summer of 2021.  Ex. 23 (Camas. Resp. to Rog. 6).

At a minimum, the Court would be required to adjudicate each of the following

issues, which vary from participant-to-participant:

- The tasks the J-1 performed as compared to their Plan and whether it can be classified as "ordinary labor";

- The staffing level of the Hotel (by department) at the time the task was performed including efforts to recruit local workers and whether the J-1 displaced any worker;

- The training received by the J-1 as compared to their Plan; and

- The cultural experiences received by the J-1.

What is more, even if a J-1 could prove that he/she provided "ordinary labor" (an individualized issue), the participant must also prove another individualized issue: that Marriott tasked the J-1 with ordinary labor "in order to exert pressure" and "to cause" the J-1 to continue working at the Hotel. 18 U.S.C. § 1589(c)(1). Plaintiff has put forward no evidence, let alone evidence common to the purported class members, on this issue. Adjudication requires an individualized analysis of the intent of the dozens of day-to-day managers and supervisors at the Hotel over the past nine years that instructed employees on the tasks to perform. No such case could ever be tried on a class-wide basis, as Marriott would have a due process right to cross-examine hundreds of witnesses on their experiences and present defenses to each one. *See Francis*, 2021 WL 4487985, at *2.

### 2. Individualized Evidence is Required to Prove Causation.

Plaintiff's forced labor claim also requires **causation**—that the "circumstances would compel or coerce a reasonable person in the *same situation* to provide or continue providing labor or services." ECF No. 65 at 8 (quotations omitted). As one court recently explained in a forced labor action, "how the class will prove causation" is a key question the court must evaluate before certifying a class. *Barrientos v. CoreCivic, Inc.*, 2023 WL 2666852, at *3 (M.D. Ga. Mar. 28, 2023) (denying certification). And "one cannot determine whether the defendant's actions coerced or forced the victim to provide labor without looking to the specific victim involved." *David*, 2012 WL 10759668, at *19. Accordingly, courts across the country, including district courts in the Tenth Circuit, have

denied class certification in forced labor cases (including cases involving J-1s), because individualized issues predominate concerning whether each class member "provided labor to Defendant[] voluntarily or were compelled to do so as a result of [some] unlawful conduct." *Francis*, 2021 WL 4487985, at *1.

The *Francis* case, which this Court relied on at the Motion to Dismiss stage, is instructive. There, the J-1 plaintiffs alleged that their internships were not what was promised for various reasons (*i.e.*, that the defendant made purportedly false representations in the recruitment stage). And, as here, the plaintiffs also alleged staffing issues, threats of deportation, and threats of financial harm. *Id.* at *10–11. The *Francis* court denied class certification, finding that individualized issues would predominate because the case involved "a wide array of representations and/or practices to which any particular employee may or may not have been subjected or compelled to work." *Id.*

As in *Francis*, here the putative class of J-1s came "from [49] different countries;…employed in different lines of work with different criteria governing the performance of that work;…may or may not have been subject to threats, which themselves were varied in context, nature and degree; and may or may not have been financially compelled to keep working." *Id.* at *12. Accordingly, an individualized review of the class member's circumstances was required, including what was promised to them and what about those promises was allegedly false. That is because the "[s]erious harm" required to prove coercion includes "any harm…that is sufficiently serious under all surrounding circumstances, to compel a reasonable person of the *same background* and *in the same circumstances* to [render labor]…." 18 U.S.C. § 1589(c)(2) (emphasis added).

With respect to alleged threats of harm, the *Francis* court explained that "[t]he fact

that a particular employee was threatened with termination and/or deportation consequences does not create a class-wide inference that all employees were subject to similar threats or felt compelled to work as a result of any such threats." 2021 WL 4487985, at *11. The impact of policies also required individualized inquiry. The court held that pay policies "do not equate to a class-wide inference that all employees felt compelled to work. Instead, the materiality of the deductions would vary based on the individual circumstances of each employee." *Id.* Concerning vulnerabilities due to financial harm, the court found that an individualized analysis is required, and the court would have to consider that J-1s must certify that they have sufficient finances to support themselves for their entire stay in the U.S., including housing and living expenses. *Id.*

Here, as illustrated in the sworn statements submitted by several J-1s, they each had unique backgrounds, experiences, and expectations. As in *Francis*, causation cannot be resolved on a class-wide basis with common proof. Rather, this Court must consider the individualized facts of the allegedly coercive conduct and individualized circumstances of each J-1 to determine whether it was reasonable for them to continue working when they otherwise wished to quit. This is especially true here, as physical coercion is not alleged. *David*, 2012 WL 10759668, at *20 (denying certification).

Other courts have reached the same conclusion in cases asserting similar theories. For example, in *Barrientos*, the plaintiffs, detainees that signed up for a work program, alleged that the defendant "created an environment that had the effect of coercing putative class members to participate in the work program, and then, upon signing up for the program, the putative class members were trapped in the program and unable to escape it" because they needed the funds it provided. 2023 WL 2666852, at *3.

The court explained that: "this action is about whether the worker detainees decided to participate and remain in the work program *because* [defendant] would subject them to some type of harm if they did not work." *Id*. at *3 (emphasis in original). The court denied certification of a forced labor claim because "Plaintiffs simply did not point to sufficient evidence from which the Court could reasonably conclude that every putative class member agreed to participate in the…work program because he was coerced to do so." *Id*. To the contrary, adjudication of that issue "requires an individualized assessment of each detainee's situation, with individual issues predominating over common ones." *Id*.

At bottom, here, as in *Francis*, "there is no singular or standardized policy or practice at issue." 2021 WL 4487985, at *10.[10] Rather, Plaintiff's allegations rest on the nature of the tasks performed—allegedly "ordinary labor"—by each J-1 under a different Plan, at a different time, in a different department, at the direction of different people. Individualized inquiry would be required to evaluate each individual J-1's circumstances to determine whether a reasonable person in their shoes would have continued working at the Hotel even when (if) they wished to quit. These issues will predominate.

### C. The Venture Liability Theory is Also Individualized.

Plaintiff's venture liability theory under 18 U.S.C. § 1589(b) fares no better. *See*

---

[10] *Menocal*, cited by Plaintiff at p. 16, is wildly different from this case. As the *Francis* court explained: "In *Menocal*, immigration detainees housed in a private contract detention facility brought a putative class action to challenge the facility's *mandatory* Housing Unit Sanitation Policy (Sanitation Policy). All detainees were subject to the Sanitation Policy. If a detainee failed to comply with the terms of the Sanitation Policy, he or she faced a range of possible sanctions" including criminal proceedings, segregation, reductions from commissary account, and/or loss of their job. 2021 WL 4487895, at *9. There, the Court found that a uniform policy constituted coercion because all detainees were necessarily in the same position, all performed the same work, and the work was of the character that a reasonable person would not have performed it but for coercion. And that the penalties were severe enough to allow a presumption that the policy caused the detainees to perform the work when they otherwise would not have done so. That is not the case here.

*Francis*, 2021 WL 4487895, at *8 n.8 (denying certification of venture claim because "whether Defendants are a 'venture'....is at play only if liability as to any one is first established and that liability cannot be litigated on a class-wide basis"). This theory requires individualized evidence regarding, for each unique J-1, whether the Sponsor undertook any conduct that constitutes a TVPRA violation (of which there is no evidence for Alliance or any other sponsor) and whether Marriott knew or should have known of that violation. It cannot be certified.

### D.    The RICO Claim is Also Individualized.

To prove a RICO claim, Plaintiff must establish: unlawful conduct of an enterprise through a pattern of racketeering caused Plaintiff injury in his business or property. *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010). Here, each element is individualized.[11]

***Enterprise.*** The enterprise element requires that there is "an entity separate and apart from the pattern [of racketeering] in which [the enterprise] engages, and its existence is proven by evidence of an ongoing organization…and by evidence that various associates function as a continuing unit." *Carlson v. Town of Mountain Vill.*, 2019 WL 1331977, at *5 (D. Colo. Mar. 25, 2019). Plaintiff has not put forward any evidence that Marriott functions as a continuing unit with any person or entity in its efforts to interview and hire J-1s, let alone common evidence that could establish the existence of an enterprise with respect to each participant. J-1s come to the Hotel via different means. An individualized analysis of how a J-1 secured a position to join the Hotel would be required and thus precludes class certification (e.g., the sponsor or recruiter used).

---

[11] The RICO claim also cannot be certified because the class definition purports to include J-1s with time-barred claims. The statute of limitations for a civil RICO claim is four years. *Dummar v. Lummis*, 543 F.3d 614, 621 (10th Cir. 2008).

***Predicate Acts***. A "'pattern of racketeering activity' requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5). Plaintiff asserts the following predicate acts: (1) forced labor, (2) visa fraud, (3) mail and wire fraud, and (4) fraud in foreign labor contracting. *See* Mot. at 8–9. Each requires individualized analysis. First, to the extent Plaintiff's RICO claim is predicated on his trafficking claims, individualized issues predominate for all of the reasons stated above. *See David* 2012 WL 10759668, at *25.

Second, Plaintiff's reliance on fraud-based predicate acts fares no better. Individualized evidence is required to prove that any statement by the Hotel in a J-1 visa document or Plan—the alleged fraud that underlies the visa fraud, mail and wire fraud, and fraud in foreign labor contracting claims[12]—is false (*i.e.*, whether any J-1 performed "ordinary labor" at the Hotel or displaced domestic workers). This Court would be required to consider all the same individualized questions described above regarding the actual training provided and work performed, along with the Hotel's staffing level at the time.

***Causation.*** A civil RICO plaintiff "is required to show that a RICO predicate offense not only was a 'but for' cause of his injury, but was the proximate cause as well." *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010). In fraud-based cases, that requires *reliance by the plaintiff* on the alleged fraud. And "[t]he pervasive issues of individual reliance that generally exist in RICO fraud actions create a working presumption against class certification." *Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.*, 319 F.3d 205, 219 (5th Cir. 2003). Plaintiff does nothing to overcome the presumption.

The *David* case is instructive. There, the plaintiffs alleged a RICO claim predicated on, as here, mail fraud, wire fraud, and forms of visa fraud based on alleged fraudulent

---

[12] Plaintiff's fraud in foreign labor contracting theory cannot be certified because Plaintiff admits that he cannot represent a class based on that predicate. *See* Mot. at 8–9.

statements about their work in visa documents. 2012 WL 10759668, at *25–29. The plaintiffs argued that this alleged fraud on the government was a common issue. The court rejected the argument, denying class certification and holding that for causation, each class member must prove reliance on the allegedly fraudulent statements—which required individualized proof regarding their review and reliance on them. *Id.*

The same result is warranted here. Plaintiff's fraud theories depend on reliance by the J-1 on an allegedly false statement in their Plan in deciding to accept an internship. That is necessarily an individualized question. Some class members, as Plaintiff who never saw his Plan before deciding to accept, may not have relied on the statements in the Plan. Reliance also requires proof of materiality. There too, it may not have been material to class members, such as Plaintiff, that the Hotel was allegedly "understaffed."

*Injury*. Finally, individualized inquiries will pervade adjudication of the injury element.[13] J-1s have attested that they *were not* injured in any way by their participation in the Program. And Marriott may assert individualized defenses to Plaintiff's claim, including that he immediately found a new job where he was able to complete his J-1 internship program and fulfill his goals, and thus did not suffer any injury.

## II.    A Class Action is Not Superior in this Case.

Rule 23(b)(3) requires that Plaintiff prove that a class trial "is superior to other available methods for fairly and efficiently adjudicating the controversy." Where, as here, the claims at issue would require "individualized trials about each class member's work history" at the Hotel (i.e., the work they actually performed) and whether they were

---

[13] District courts must "consider the extent to which material differences in damages determinations will require individualized inquiries." *Roderick*, 725 F.3d at 1220. Here, Plaintiff does not establish that a common method can be used.

23

unlawfully coerced to provide such labor, class adjudication would be "unmanageable" and certification should be denied. *Roe*, 257 F.R.D. at 173.[14]

### III.    Plaintiff Has Not Established Commonality, Typicality, or Adequacy.

The "commonality, typicality, and adequacy requirements of Rule 23(a) 'tend to merge.'" *Roderick*, 725 F.3d at 1219 (quoting *Wal-Mart*, n.5). That is because, when, as here, a claim requires individualized adjudication, there are not common questions, the named plaintiff is not typical of the class he seeks to represent, and he cannot adequately represent the class because his claim does not prove their claims. *See id.*

**Commonality.** "[T]o satisfy the commonality requirement of Rule 23(a)(2), the class's claims 'must depend on a common contention' that 'must be of such nature that is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Brayman*, 83 F.4th at 837 (quoting *Wal-Mart*, 564 U.S. at 350). This requires more than the "mere raising of common questions," "even in droves," "but rather the capacity of a classwide proceeding to *generate common answers apt to drive resolution of the litigation*." *Wal-Mart*, 564 U.S. at 350 (emphasis added). Plaintiff's six purported common questions are either superficial (*e.g.*, whether Marriott works with Sponsors) or cannot be resolved with class-wide evidence (*e.g.*, whether J-1s performed "ordinary employment" work). Instead, the issues that go to the heart of the claims are all individualized in nature

---

[14] The proposed class includes foreign class members, *see* Mot. at 10, which weighs against class certification because a U.S. class-action judgment may not be given preclusive effect in foreign countries. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 263–64 (2d Cir. 2016). "Plaintiff[] carr[ies] the burden of demonstrating that foreign court recognition is more likely than not," and his failure to do so "weighs against a finding of superiority." *Anwar v. Fairfield*, 289 F.R.D. 105, 115 (S.D.N.Y. 2013).

involving divergent fact patterns among the J-1s.[15] *See Trevizo*, 455 F.3d at 1163.

**Typicality.** Plaintiff cannot demonstrate that his claims, and the defenses to which he is subject, "are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3); *Francis*, 2021 WL 4487985, at *7. Plaintiff's allegations about the work he performed and the training he did or did not receive are vastly different from the experiences of other J-1s as demonstrated by their sworn statements.[16] *See Panwar v. Access Therapies, Inc.*, 2015 WL 329013, at *6 (S.D. Ind. Jan. 22, 2015) ("Because all of the proposed class members were not subjected to the same course of conduct, resulting in differing claims and defenses than those applicable to [the named plaintiffs], Plaintiff have failed to satisfy Rule 23(a)'s typicality requirement").

**Adequacy.** Plaintiff's claim is subject to individualized defenses (*e.g.,* his own admissions disprove his allegations) render him an inadequate class representative for Rule 23(a)(4).[17] That he (or his lawyers) now bases the theory of forced labor on a purported claim that he never would have worked at the Hotel had he known it was understaffed strains credulity. Plaintiff is not an adequate representative.

## CONCLUSION

For all of the foregoing reasons, Plaintiff's Motion should be denied.

---

[15] While "Rule 23(b)(3)'s predominance criterion is 'far more demanding' than Rule 23(a)'s commonality requirement," *Roderick*, 725 F.3d at 1220, courts often find both requirements are not met. *See Trevizo*, 455 F.3d at 1163.

[16] Plaintiff also is subject to unique defenses, including that he was not recruited, that he did not rely on his Plan in deciding whether to accept, and he voluntarily quit after finding a new job that matched his personal preferences. These are individualized issues of fact and law that will affect Plaintiff's claim but would have no bearing on any other class member's claim, making him not typical of the class he seeks to represent.

[17] E.g., the alleged "understaffing" of the Hotel's kitchen cannot be material to Plaintiff when he chose to leave for another hotel that was understaffed. He cared little about staffing levels and was interested in a better personal opportunity and a higher pay rate.

Date: May 30, 2025          */s/ Michael P. O'Day*
                           Michael P. O'Day
                           Ellen E. Dew
                           William W. Reichart III

                           DLA Piper LLP (US)
                           650 S. Exeter St.
                           Suite 1100
                           Baltimore, MD 21202
                           Tel.: (410) 580-3000
                           Fax: (410) 580-3001
                           michael.oday@us.dlapiper.com
                           ellen.dew@us.dlapiper.com
                           wes.reichart@us.dlapiper.com

                           *Counsel for Defendant Marriott International, Inc.*

## REQUEST FOR ORAL ARGUMENT

Defendant Marriott International, Inc. respectfully requests oral argument in connection with Plaintiff's Motion for Class Certification. On a Motion for Class Certification, the Court must rigorously analyze the law and evidence. Defendant believes that oral argument will be helpful to the Court's required rigorous analysis.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 30th day of May, 2025, I filed the foregoing document and all attachments and appendices thereto and cause the same to be served on all counsel of record via the Court's CM/ECF system.

                           */s/ Michael P. O'Day*
                           Michael P. O'Day