## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

DANIEL ESTEBAN CAMAS LOPEZ,
individually and on behalf of all similarly
situated persons,

      Plaintiff,

v.                                      Case No. 1:23-cv-03308-RMR-KAS

MARRIOTT INTERNATIONAL, Inc.,

      Defendant.

---

### PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

As detailed in Plaintiff's Motion for Class Certification, ECF No. 67 (April 11, 2025), ("Motion"), Plaintiff seeks to certify a proposed class of the approximately 362 interns and trainees who came to work at the St. Regis Hotel in Aspen ("St. Regis") to receive advanced training in the hospitality industry as part of the J-1 visa program from September 2016 to the present.

In response, Defendant Marriott International Inc. ("Marriott") principally argues that each element of Plaintiff's claims requires individualized proof which predominates over any common questions and also undermine commonality, typicality, adequacy, and superiority. *See* Defendant Marriott International, Inc.'s Opposition to Plaintiff's Motion for Class Certification, ECF No. 79 (May 30, 2025) (hereinafter "Opposition" or "Opp."). But these arguments demonstrate a fundamental misunderstanding of the legal and factual bases underlying Plaintiff's claims. This Court should reject Marriott's invitation to alter the bases of Plaintiff's claims, thereby obscuring the common issues at the heart of Plaintiff's legal theories, based on premature merits disputes.

Because the proposed class meets all the requirements of Rule 23(a) and Rule 23(b)(3), the Motion should be granted.

## ARGUMENT

I. **The Heart of Plaintiff's Claims—that Marriott Relied on Plaintiff and the Class to Fill Ordinary Labor Needs—Can Be Established with Common Evidence.**

The consistent theme of Marriott's Opposition is the mistaken belief that for Plaintiff's claims to succeed, Plaintiff must rely on evidence regarding the specific terms of his training plan, tasks performed, hours worked and requested, level of staffing in his department, and other purportedly individualized inquiries. But these arguments are rooted in premature merit disputes, mischaracterization of Plaintiff's legal theories, and conflation of evidence *necessary* to establish Plaintiff's legal theories with circumstances that may provide additional *supporting evidence*.

The heart of Plaintiff's legal theories underlying both his trafficking claims and his RICO claim is that Marriott relied on Plaintiff and the class to fill ordinary labor needs in violation of the purpose and requirements of the J-1 visa program. Plaintiff can establish this practice occurred on a classwide basis based on common evidence, such as:

- Marriott's acknowledgement during its 30(b)(6) deposition that "We use international students obviously to assist with the operation," Ex. 4 to Motion, 30(b)(6) Dep. at 33:11-15;

- The fact that the St. Regis HR director included J-1 workers in requests to supervisors for the "numbers [of employees] to sustain the operations needs and pressure during the busy season," Ex. 11 to Motion, p. 1; and

- The St. Regis recruiting manager's admission that "h2b and J1 status is irrelevant in this stage" when asking to get a headcount "per role" in order to meet staffing level, Ex. 10 to Motion, p. 4.

*See also* Motion, pp. 4-6 (describing evidence regarding Marriott's uniform reliance on J-1 interns and trainees to fill ordinary labor needs). This evidence is common to the class because it concerns whether *Marriott's* purpose and intent in obtaining the labor of J-1 trainees and interns was to fill an ordinary labor need. *See CGC Holding Co., LLC v. Broad and Cassel*, 773 F.3d 1076, 1093 n.11 (10th Cir. 2014) (observing that "whether Hutchens and his alleged coconspirators actually

2

misrepresented *their ability or intent* to satisfy the loan commitments" was a "central, generalized element" that "can be shown with evidence common to the entire class" (emphasis added)).

Marriott argues that Plaintiff cannot establish "that Marriott violated the prohibitions on 'ordinary labor' with respect to each J-1 in the purported class" based on classwide evidence because "distinguishing between permissible work-based training and impermissible ordinary labor requires a nuanced and individualized analysis of the activities performed." Opp., pp. 15-16.

In making these arguments, Marriott relies on snippets of State Department rulemaking documents from 2006 and 2007. *Id.* (citing 71 F.R. 17768–01 (2006); 72 F.R. 33669-01 (2007). But, when read in context, the State Department's analysis actually supports Plaintiff's legal theory. The question of whether J-1 interns and trainees are used for ordinary employment purposes *does not* depend on an analysis of the specific tasks assigned and performed. Rather, it depends on the *purpose for which they are used* and the *types of positions* in which they are placed. For example, in the 2007 interim final rule, the State Department agreed with the findings of a 2005 report from the Government Accountability Office titled "Stronger Action Needed to Improve Oversight and Assess Risks of the Summer Work Travel and Trainee Categories of the Exchange Visitor Program," which found that "the potential exists for the Trainee Program to be misused as an employment program. Regulations strictly prohibit the *use* of the trainee category *for ordinary employment purposes*, stating in particular that sponsors must not place trainee participants *in positions that are filled or would be filled by full-time or part-time employees*." *See* 72 F.R. 33669-01 (2007) (quoting GOA Report, p. 20) (emphasis added).[1] The State Department

---

[1] The 2005 GOA Report provides several examples of ways in which training programs are "[v]ulnerable to [m]issue as [an] [e]mployment [p]rogram," including:

- "[A] sponsor learned that an organization it had contracted with to help select and place trainees had placed the participants with employers that had contracts to provide H-2B temporary workers. The organization had participated in the Trainee Program because the

Recognized that "the Fulbright-Hays Act and the Exchange Visitor Program regulations were not meant to supply U.S. employers with employees under the guise of being trainees." *Id.* The State Department also recognized that there had been instances in which "some sponsors were misusing training programs," including where "trainees were not receiving any training and were actually being *used as 'employees.'* " 71 F.R. 17768–01 (2006) (emphasis added).

As these rulemaking documents underscore, the relevant inquiry at the heart of Plaintiff's claims depends on the *purpose for which Marriott used the J-1 program* and the *types of roles* J-1 interns and trainees filled—not the details of day-to-day tasks as Marriott suggests. Accordingly, Plaintiff's legal theories rely on *Marriott's conduct*—namely, its approach to obtaining and utilizing the labor of J-1 interns. Plaintiff has set forth evidence regarding Marriott's uniform reliance on J-1 interns and trainees to fill ordinary labor needs throughout the class period. *See* Motion, pp. 4-6. At the class certification stage, this is sufficient to establish common legal and factual issues that can be tested on the merits on a classwide basis.

The purportedly individualized factual issues raised by Marriott—such as whether the tasks described in the Plan were actually performed, whether participants participated in cultural activities, participants' specific hours worked or time off received, or the specific staffing levels at the St. Regis at any given time—may be relevant *supporting evidence* of Plaintiff's claims

---

H-2B visa category was at its limit and it was looking for an alternative way to receive foreign workers;"
- Instances where "there is not even an attempt to represent jobs as training, and that employers refer to the participants as employees rather than trainees;" and
- Instances where "dairies were exploiting the J-1 trainees for cheap labor and in most cases were not concerned with actually training them beyond what was necessary to perform their work."

GAO Report: *Stronger Action Needed to Improve Oversight and Assess Risks of the Summer Work Travel and Trainee Categories of the Exchange Visitor Program*, U.S. GOV. ACCOUNTABILITY OFFICE (Oct. 2005), GAO-06-106, at 20-21, available at https://www.gao.gov/assets/gao-06-106.pdf.

insofar as they provide additional evidence to support a classwide finding that Marriott relied on Plaintiff and the class to fill ordinary labor needs in violation of the purpose and requirements of the J-1 visa program, but Plaintiff's legal theories do not rely on establishing those facts with respect to every class member. Because the purportedly individualized factual inquiries raised by Marriott are not necessary to establish liability pursuant to Plaintiff's legal theories and are not at the heart of Plaintiff's claims, they do not undermine the ability of Plaintiff's claims to be adjudicated on a classwide basis.

Throughout Marriott's opposition, it "scrutinize[s] the proposed class for noncommon issues, rather than common ones." *Sherman v. Trinity Teen Solutions*, 84 F4th 1182, 1193 (10th Cir. 2023). The Tenth Circuit unequivocally rejected this approach in *Sherman*. In *Sherman*, the Tenth Circuit rejected the district court's commonality analysis because it focused on "whether any individualized issues would be necessary to resolve the putative class's claims rather than whether Plaintiff has demonstrated the class shared at least one common question of law or fact." *Id.* It similarly rejected the district court's conclusion that predominance could not be met where "each potential class member's evidence would be unique and particular to their time and experience at [Trinity]." *Id.* at 1195 (quoting district court). This Court should reject Marriott's invitation to engage in the precise method of analysis already rejected in *Sherman*.

The Parties clearly dispute whether Plaintiff's legal theories suffice to support his claims. But Plaintiff need not prove the merits of his claims at class certification. Instead, Plaintiff must show that his claims are susceptible to class treatment. Marriott cannot rely on merits disputes to obfuscate the common factual and legal questions at the heart of Plaintiff's claims. The answers to the questions posed by the Parties' disputes over the merits of Plaintiff's legal theories are common questions that can be resolved on a classwide basis at the merits stage.

II.    **Plaintiff Has Established Predominance**.

As detailed in Plaintiff's Motion, *see* Motion, pp. 12-15, predominance is satisfied when "the common, aggregation-enabling issues in the case are more prevalent or important than the non-common, aggregation-defeating individual issues." *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting Newberg on Clas Actions). "[I]t is not necessary for a plaintiff to show that all of the elements of the claim entail questions of fact and law that are common to the class or that the answers to those common questions are dispositive." *Brayman v. KeyPoint Gov't Sols*, 83 F.4th 823, 838 (10th Cir. 2023).

Marriotts principal argument in opposition to class certification is that individualized inquiries are necessary to establish both Plaintiff's trafficking claims and his RICO claim. *See* Opp., pp. 13-23. But an examination of the key elements of Plaintiff's claims confirms that Plaintiff can establish his legal theories with evidence common to the class. Marriott may disagree with the merits of Plaintiff's legal theories, but such disagreement does not undermine the ability of his theories to be tested on the merits on a classwide basis.

A. **The Elements of Plaintiff's Trafficking Claims Can Be Established with Common Evidence.**

Plaintiff alleges that Marriott violated state and federal trafficking laws by obtaining or attempting to obtain the labor or services of Plaintiff and class members through abuse of the J-1 program (or benefiting from a venture that did so) in violation of state and federal trafficking laws. *See* Motion, p. 8. The key elements of these claims depend on common factual and legal questions that can be established with evidence common to the class.

1. *Whether Marriott Engaged in Impermissible Means in Order to Obtain Labor or Services of Plaintiff and the Class*

As an initial matter, Marriott incorrectly asserts that Plaintiff "abandons" other theories of coercion in pursuit of his abuse of law or legal process theory. Opp., pp. 14-15. Not so. Certainly,

the core of Plaintiff's legal theory supporting his trafficking claims is the abuse of law or legal process. But, as Plaintiff has continued to maintain, liability can be established based on "a combination of one or more prohibited means." *See* Motion, pp. 13-14 (citing 18 U.S.C. § 1589(a)); *accord Recommendation of United States Magistrate Judge*, ECF No. 58 (Feb. 27, 2025), pp. 8-9 (hereinafter "R&R"). In other words, while the *heart* of Plaintiff's trafficking claim is an abuse of legal process—and success on that basis alone would be sufficient to establish liability for his trafficking claims—additional facts may provide *supporting evidence* that Marriott engaged in impermissible means in order to obtain labor or services of Plaintiff and the class.

Accordingly, the core question at the heart of Plaintiff's trafficking claim is whether Marriott abused the J-1 program in order to obtain the labor or services of Plaintiff and the class. Certainly, discovery into the merits may reveal that Marriott utilized additional impermissible means to obtain labor from Plaintiff and the class *in combination* with the abuse of legal process, but because abuse of legal process alone establishes liability, adjudication would not require an analysis of whether Marriott subjected each individual class member to additional coercion. Any evidence of additional coercion, even if individualized, would be relevant to supporting classwide findings that (1) Marriott engaged in a *combination* of impermissible means and (2) Marriot did so *in order to* obtain labor or services from Plaintiff and the class. For example, evidence related to specific threats of deportation directed at Plaintiff or one or more other class members would support such findings even though threats of deportation are not at the core of Plaintiff's legal theory and not necessary to establish liability for Plaintiff's trafficking claims.

The core question at the heart of Plaintiff's trafficking claim—whether Marriott abused the J-1 program—can be answered with evidence common to the class as detailed above. *See supra* Part I. The questions of (1) whether Marriot's approach to hiring and staffing J-1 interns violates

the J-1 program requirements; and (2) whether such a violation constitutes an abuse of legal process within the meaning of anti-trafficking laws are common issues.

Marriott argues that this legal theory fails because Plaintiff cannot establish the alleged abuse of law or legal process was undertaken "*in order to exert pressure on another person to cause that person to take some action or refrain from taking some action*" without individualized evidence. Opp., p. 15 (quoting 18 U.S.C. § 1589(c)(1)) (emphasis in original); *accord id.* at 17. But this overlooks the entire premise of Plaintiff's legal theory, which focuses on the *purpose* for which Marriott used the J-1 program. *See supra* Part I. As detailed above, Plaintiff's contention that Marriott relied on J-1 interns and trainees for the impermissible purpose of filling their ordinary labor needs can be established on a classwide basis. *Id.*; *see also CGC Holding Co.*, 773 F.3d at 1093 n.11 (intent to satisfy commitment and legitimacy of operation "can be shown with evidence common to the entire class" (emphasis added)).

Marriott's suggestion that adjudication would require "an individualized analysis of the intent of the dozens of day-to-day managers and supervisors at the Hotel over the past nine years that instructed employees on the tasks to perform" again mischaracterizes Plaintiff's legal theories. The conduct Plaintiff challenges involves the *purposes* underlying Marriott's overall approach to hiring and staffing J-1 interns and trainees and the *types of roles* in which J-1 interns and trainees were placed—decisions made at the organizational level—not the day-to-day tasks assigned by particular managers or supervisors. Plaintiff has set forth evidence regarding Marriott's uniform reliance on J-1 interns and trainees to fill ordinary labor needs. *See* Motion, pp. 4-6.

### 2. Whether Marriott Did Obtain Labor or Services of Plaintiff and the Class by Impermissible Means

As an initial matter, because Plaintiff's trafficking claims include an attempt theory, the question of whether Marriott *succeeded* in obtaining the labor or services of Plaintiff and the class

by impermissible means is not necessary to establish a classwide violation. *See* 18 U.S.C. § 1594(a) ("Whoever attempts to violate section . . . 1589 . . . shall be punishable in the same manner as a completed violation of that section"). Because it is not core to Plaintiff's TVPA claim, certification of that claim would be appropriate regardless of whether that question could be established by classwide evidence. Nevertheless, this question can also be established with common evidence.

Marriott argues that "one cannot determine whether the defendant's actions coerced or forced the victim to provide labor without looking to the specific victim involved" and thus individualized issues predominate. *See* Opp., pp. 17-20 (quoting *David*, 2012 WL 10759668, at *19). But its reliance on *Francis v. APEX USA, Inc.* is misplaced. *See id.* (citing 2021 WL 4487985 (W.D. Okla. Sept. 30, 2021)). In *Francis*, the court found that individual issues predominated because the plaintiffs' legal theory (a TVPA violation based on threats of serious harm) involved thirteen different "common practices" made Plaintiffs feel compelled to work, unlike the single, uniform policy at issue in *Menocal*. *See* 2021 WL 4487985, at *10.

But here, as in *Menocal* and *CGC Holding Co.* (on which *Menocal*'s logic relies), causation can be established by classwide inferences. *See Menocal v. GEO Group, Inc.*, 882 F.3d 905, 918-22 (10th Cir. 2018) (citing *CGC Holding Co.*, 773 F.3d 1076 (10th Cir. 2014)). A classwide inference of causation is appropriate "because [Plaintiff's trafficking claims] are based on a single, common scheme"—Marriott's reliance on the J-1 visa program to fill ordinary labor needs—and "class members share the relevant circumstantial evidence in common"—such as the fact that Plaintiff and the class were subject to the same requirements of the J-1 visa program, making them similarly vulnerable to coercion; Marriott's scheme utilized repeated, nearly identical representations to the J-1 Interns and the State Department to bring class members to the St. Regis to meet its ordinary labor needs; the same alleged legitimacy of the promised J-1 positions. *See*

*Menocal*, 882 F.3d at 920. These considerations "mak[e] class-wide proof possible." *Id.*

"[H]ypothetical alternative explanations for the class members' labor do not defeat [Plaintiff's]

showing that the causation element is susceptible to class-wide proof." *Id.* at 921.

### 3. Whether Marriott Benefited or Attempted to Benefit from Participation in a Venture Engaged in Trafficking Violation with Knowledge or Reckless Disregard

In the alternative, Plaintiff could establish his trafficking claims based on a venture

beneficiary theory. Marriott argues that Plaintiff's venture liability theory under 18 U.S.C. §

1589(b) is also individualized because it still depends on an individualized liability determination.

*See* Opp., pp. 20-21 (citing *Francis*, 2021 WL 4487895, at *8 n.8). But because liability in this

case is not an individualized determination, as detailed above, this argument also fails.

### 4. Damages

To the extent Marriott argues that Plaintiff fails to establish a common method to consider

damages, *see* Opp., p. 23 n.13, he does not have to, as individualized damage calculations do not

defeat a finding that common issues predominate. *See Sherman v. Trinity Teen Solutions*, 84 F4th

1182, 1193 (10th Cir. 2023) ("the court's brief reference to the need for individualized damages

inquiries is insufficient to sustain its conclusion that the proposed class fails Rule 23(b)(3)'s

predominance requirement").

### 5. Marriott's Attached Declarations from Absent Class Members Do Not Defeat Class Certification.

Marriott submits four declarations from absent class members that are all currently working

at the St. Regis. *See* Respondent's Appx., pp. 1-35. Marriott relies on these declarations to suggest

that, because these four individuals purport to have had positive experience at the St. Regis, they

could not establish coercion or injury to support their claims. *See* Opp., pp. 1-2, 7-8.

But, as other courts have cautioned, "courts should be very, very careful before relying too much on 'happy camper' declarations from existing employees, because employees might feel pressure to toe the company line." *Hale v. Brinker International, Inc.,* 765 F.Supp.3d 904, 918 (N.D. Cal. 2025). For that reason, many courts have recognized that statements solicited by employers from their current employees are of limited evidentiary value at the class certification stage. *See, e.g.*, *Salinas v. Cornwell Quality Tools Company*, 635 F.Supp.3d 954, 976 (C.D. Cal. 2022) ("Courts, however, have found that such 'happy camper' declarations are generally not sufficient to defeat a finding of adequacy or typicality"); *DaSilva v. Border Transfer of MA, Inc*, 296 F.Supp.3d 389, 401 (D. Mass. 2017) ("The defendants have put forward some 'happy camper' affidavits presenting that some drivers have some flexibility, but this does not defeat commonality or predominance"); *see also Avendano v. Averus, Inc.*, 2015 WL 1529354, at *7 (D. Colo. March 31, 2015) ("generally afford little importance to the so-called 'happy camper' affidavits of co-workers offered by defendants at [FLSA conditional certification]").

Even if such declarations were reliable, the fact that some class members purport to have had "positive experiences" or "met their goals" is not dispositive of the legal questions at the heart of this case, such as whether Marriott obtained their labor by abusing the J-1 visa program or whether that caused injury, such as from payment of program costs. To the extent they are relevant, they are simply examples of circumstantial evidence relevant to the common merits issues underlying Plaintiff's claims. *See, e.g.*, Respondent's Appx., p. 34 ("I am not aware of any J-1 trainees or interns stating that they are being treated as 'cheap labor' or 'ordinary labor' at the St. Regis Aspen Resort, or anything to that effect").

### B. The Elements of Plaintiff's RICO Claim Can Be Established with Common Evidence.

Plaintiff alleges that Marriott violated RICO, 18 U.S.C. § 1962(c), by engaging in an enterprise with J-1 visa sponsors that: (1) committed forced labor violations; (2) committed visa fraud by "falsely mak[ing]" and submitting to the State Department internship training plans and other documents "for entry into or as evidence of authorized stay or employment in the United States" (18 U.S.C. § 1546); (3) "knowingly and with intent to defraud recruited, solicited, or hired a person outside the United States or caused another person to recruit, solicit, or hire a person outside the United States … for purposes of employment in the United States by means of materially false or fraudulent pretenses" (18 U.S.C. § 1351(a)); and (4) utilized mail and wire to engage in the fraudulent scheme. The key elements of this claim depend on common factual and legal questions that can be established with evidence common to the class.

#### 1. Whether Marriott Was Engaged in a RICO Enterprise with Recruiters and Sponsors

Marriott argues that "Plaintiff has not put forward any evidence that Marriott functions as a continuing unit with any person or entity in its efforts to interview and hire J-1s, let alone common evidence that could establish the existence of an enterprise with respect to each participant." Opp., p. 21. But whether Marriott was engaged in a RICO enterprise with recruiters and sponsors is a merits question common to the class because it depends on evidence regarding Marriott's relationships and conduct—not evidence with respect to any particular J-1 intern. *See Just Film, Inc. v. Buono*, 847 F.3d 1108, 1121.n3 (9th Cir. 2017) (observing that issues related to existence of RICO enterprise "are appropriate for classwide litigation because they focus on [the] Defendants' conduct"); *MacDonald v. Cashcall, Inc.*, 333 F.R.D. 331, 353 (D.N.J. 2019) ("Whether Defendants engaged in conduct as part of RICO enterprise is common to the class (and raises no individual issues whatsoever)"); *Bias v. Wells Fargo & Company*, 312 F.R.D. 528, 541

(N.D. Cal. 2015) ("the first three elements are particularly amenable to class certification because they focus on Defendants' conduct, and not that of class members").

Either an enterprise existed, or it didn't. While Plaintiff does describe some of the relevant evidence collected thus far regarding the relationship between Marriott, sponsors, and recruiters, *see* Motion, pp. 3-6, the resolution of this common question is premature until the merits stage.

### 2. Whether Marriott and the Enterprise Engaged in a Pattern of Racketeering Activity

To establish the pattern of racketeering activity element, Plaintiff will have to establish that Marriott and the enterprise engaged in at least two predicate acts—here, at least two instances of forced labor, visa fraud, fraud in foreign labor markets, and/or mail and wire fraud. Marriott argues that Plaintiff would need to rely on individualized evidence regarding each class member in order to establish a pattern of racketeering activity. But these arguments conflate the pattern of racketeering element—which concerns whether Marriott and the enterprise engaged in prohibited acts—with the elements requiring that Plaintiff and class member experienced an injury caused by the RICO violation. Again, the focus of this element is on the conduct of Marriott and the enterprise—not the individual class members—and thus may be established by common proof. Either Marriott engaged in such conduct or it didn't.

A plaintiff may use predicate acts targeting other victims to show evidence of a "pattern" of racketeering as long as at least one act injures the plaintiff. *See Corley v. Rosewood Care Ctr., Inc.*, 388 F.3d 990, 1004 (7th Cir. 2004) ("requiring the plaintiff to prove injury from all of the predicate acts would conflate what must be two separate inquiries: first, was there a pattern of racketeering activity violating RICO, and second, was the plaintiff injured by the RICO violation?" (internal quotation omitted)); *Deppe v. Tripp*, 863 F.2d 1356, 1366-67 (7th Cir. 1988); *Kearny v. Hudson Meadows Urban Renewal Corp.*, 829 F.2d 1263, 1268 (3d Cir.1987); *Marshall & Ilsley*

*Trust Co. v. Pate*, 819 F.2d 806, 809–10 (7th Cir.1987). In other words, Plaintiff need not show that he and each class member were the target of each predicate act.[2] Here, Plaintiff can establish that Marriott engaged in numerous predicate acts through evidence common to the class.

First, as detailed above, Plaintiff can use common evidence to establish that Marriott engaged in multiple instances of trafficking (one per each individual class member).

Second, Plaintiff's visa fraud theory—that Marriott "falsely ma[de]" DS-7002 forms, which are documents used "for entry into or as evidence of authorized stay or employment in the United States," 18 U.S.C. § 1546, can also be established with common evidence because it relies on uniform certifications on the DS-7002 completed for Plaintiff and each member of the class, including that "[t]he Trainee or Intern named in this T/IPP will not displace full-or part-time, seasonal or permanent American workers, or serve to fill a labor need." *See, e.g.*, Movant's Appx., pp. 10; Respondent's Appx., pp. 208, 232, 256, 280, 304, 328, 398. As detailed above, Plaintiff can establish the falsity of this certification with common evidence. *See supra* Part I.

Additional, more specific, misrepresentations in particular training plans may be relevant *supporting evidence* of Plaintiff's claims insofar as they provide additional evidence to support a classwide finding that Marriott relied on Plaintiff and the class to fill ordinary labor needs in violation of the purpose and requirements of the J-1 visa program, but Plaintiff's legal theories do not rely on establishing those facts with respect to every class member. *See supra* Part I. That same common evidence can establish multiple fraud in foreign labor markets predicates (one for each J-1 Intern that came directly from their home country to the United States to work at St. Regis).

---

[2] For this same reason, this Court should reject Marriott's erroneous suggestion that by acknowledging that Marriott did not violate the fraud in foreign labor markets statute with respect to him that he cannot represent a class that experienced harm from such predicates as part of the broader pattern of racketeering activity. *See* Opp., p. 22.n12.

Finally, Plaintiff can also establish multiple mail and wire fraud predicates—which depend on the same misrepresentations made in the DS-7002 training plans—based on the same common evidence, as well as common evidence that the plans were created and submitted over the mail and wires. *See, e.g.*, Motion, p. 3 (describing electronic submission of DS-7002 forms).

### 3. Whether the Pattern of Racketeering Activity Caused Injury to Plaintiff and the Class

Plaintiff can establish at least one injury common to the class as a whole—paying the costs of participating in the J-1 program. *See* Motion, p. 6 (describing unreimbursed costs). While there may be individual discrepancies in the amounts paid, such differences are merely a difference in damages, which would not preclude certification. *See supra* Part II(A)(4). This injury exists regardless of whether class members purport to have had a "positive experience" at the St. Regis, *see supra* Part II(A)(5) (addressing happy camper declarations), because the injury stems from the *noncompliance* of the positions—not participants' subjective feelings about them.

Marriott argues Plaintiff "did not suffer any injury" because "he immediately found a new job where he was able to complete his J-1 internship program and fulfill his goals." Opp., p. 23. This potential defense does not negate Plaintiff's injury—common to the class—stemming from payment of program costs during the time he worked at the St. Regis. *See See* 2 William B. Rubenstein, Newberg on Class Actions § 4:55 (6th ed. 2025) ("Affirmative defenses will foreclose a finding that common issues predominate only where they are, for some reason, unusually important or are coupled with other individual issues.").

Plaintiff can also establish causation on a classwide basis. To do so, Plaintiff need only show that *at least one* predicate act was the actual and proximate cause of each class member's injuries—not that each class member's injury was caused by every predicate act. *See supra* Part II(B)(2) (citing *Corley*, 388 F.3d at 1004; *Deppe*, 863 F.2d at 1366-67; *Kearny*, 829 F.2d at 1268;

*Marshall*, 819 F.2d at 809–10). Accordingly, Plaintiff could establish this element even if based solely on a trafficking predicate. Plaintiff can also establish causation with respect to at least one of the fraud predicates on a classwide basis because all of the fraud predicates are based on the same uniform misrepresentations made on the DS-7002 forms. *See supra* Part II(B)(2).

With respect to the fraud predicates, Marriott argues that "Plaintiff's fraud theories depend on reliance by the J-1 on an allegedly false statement in their Plan in deciding to accept an internship," which "is necessarily an individualized question." Opp., p. 23. In addition to misunderstanding Plaintiff's legal theories, Marriot's premise is "at odds with [more] recent decisions from the Supreme Court and [other] court[s] emphasizing that RICO claims predicated on mail and wire fraud do not require first-party reliance to establish that the injuries were proximately caused by the fraud." *Torres v. S.G.E. Management, L.L.C.*, 838 F.3d 629 (5th Cir. 2016) (citing *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008); *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 676 (5th Cir. 2015)).

Here, as in *Bridge* and *Torres*, Plaintiff need not establish individual reliance to establish causation. Plaintiff could establish—on a classwide basis—that he and class members' injuries (the costs of participating in the J-1 program at the St. Regis) resulted from the State Department's reliance on Marriott's uniform misrepresentations made in the DS-7002 forms. The DS-7002 forms are created and submitted as part of the process for obtaining and/or maintaining participants' J-1 visa status, and the State Department relies on the representations, attestations, and certifications in those forms both when granting participants admission into the United States prior to the start of their J-1 internship and when authorizing continued admission and visa status. In other words, if Marriott had not made this "false attestations of compliance" with the J-1 program, Plaintiff and the class would not have been "permitted . . . to participate" in the program

by working at the St. Regis, and the injury (payment of program costs for portion of program
worked at the St. Regis) "would have never materialized." *Bridge*,  553 U.S. at 658. Because the
participants' injuries arise from the J-1 program's cost structure and uniform representations that
J-1 internship positions will be compliant with the requirements of the J-1 program, injury and
causation can be established on a classwide basis. *See Torres v. S.G.E. Management, L.L.C.*, 838
F.3d 629 (5th Cir. 2016) ("The participants' injuries arise from the scheme's payment structure,
and the inherent concealment of the inevitableness of those injuries").

While not required to establish causation, Plaintiff can nevertheless establish reliance on a
classwide basis. Contrary to Marriott's suggestion, Plaintiff's legal theory does not require him or
class members to have seen and relied on the specific terms of their training plans, as outlined in
the DS-7002, <u>before</u> they committed to work at the St. Regis. Rather, Plaintiff and class members
accepted their positions (and proceeded to incur fees and costs) with the understanding that they
would be provided with an internship that met the requirements of the J-1 program.[3] <u>That</u> is the
representation they relied on. The specific terms of the training plans themselves may be important
insofar as they provide *supporting evidence* of Marriott's failure to actually provide the promised
internships, but Plaintiff's theory does not rely on having seen those plans in advance or on having
relied on any particular term of their training plan. Marriott argues that such reliance must be

---

[3] This distinguishes the current case from *David v. Signal Intern, LLC*, 2012 WL 10759668 (E.D.
La. Jan. 4, 2012). In *David*, the Court acknowledged that "proving that the government relied on
misrepresentations in approving H–2B status for Signal, and ultimately in issuing the hundreds
of H–2B visas when the individual plaintiffs applied for them, does not trigger the individual
questions that can often derail certification of fraud-based RICO actions" and that the fraud on
the government was one of the but-for causes of a portion of the alleged injuries. 2012 WL
10759668, at *28-29. However, unlike in this case, the fraud regarding compliance with program
requirements was not the crux of the *David* plaintiffs' legal theory, which involved false
representations to plaintiffs regarding green cards. *Id.*

"material," but it strains credulity to suggest that the compliance of a J-1 position with the requirements of the J-1 visa program would not be material.

Both the "alleged legitimacy" of the promised J-1 positions and "the fact that all plaintiffs paid fees in exchange for a promise" of a compliant position are "proper grounds to infer reliance on a classwide basis. *CGC Holding Co.*, 773 F.3d at 1090-91; *see also, e.g.*, *id.* at 1092 (finding class of persons "who all paid substantial up-front fees in return for financial promises" could "infer reliance on a classwide basis"); *see also Robinson v. Fountainhead Title Grp. Corp.*, 257 F.R.D. 92, 95 (D.Md.2009) ("[I]t would be a reasonable inference to assume that a class member who purchased services from Assurance Title relied on the legitimacy of that organization in paying the rate charged."); *Cullen v. Whitman Med. Corp.*, 188 F.R.D. 226, 235 (E.D.Pa.1999) ("If the plaintiffs can prove that UDS was a complete sham, then a fact finder can infer from the evidence that anyone who paid tuition and attended the school suffered damage.").

Here, similarly to in *CGC Holding*, it is reasonable to infer that Plaintiff and other class members would not have incurred the costs of participating in the J-1 program at St. Regis had they not been relying on Marriott's representations regarding the compliance of their positions with the J-1 visa program requirements. Because Marriott inherently represented that the J-1 positions would be compliant with the J-1 program by offering and providing Plaintiff and the class with such positions, Plaintiff's legal theory can be established on a classwide basis.

### III.    Plaintiff Has Established Commonality, Typicality, and Adequacy.

The proposed class meets the requirements of commonality, typicality, and adequacy.[4] *See* Motion, pp. 10-12. Marriott's arguments to the contrary largely parrot its predominance arguments, Opp., p. 24, and they fail for the same reasons, *see supra* Part II.

---

[4] Marriott does not contest numerosity. *See* Motion, pp. 9-10.

Marriott also argues that Plaintiff cannot establish typicality or adequacy because of purportedly individualized defenses, "including that he was not recruited, that he did not rely on his Plan in deciding whether to accept, and he voluntarily quit after finding a new job that matched his personal preferences" and that "the alleged 'understaffing' of the Hotel's kitchen cannot be material to Plaintiff." Opp., p. 25 n.16 & n.17. But neither of Marriot's arguments regarding "recruitment" nor "voluntarily quit[ting]" would defeat Plaintiff's trafficking claims, *see R&R*, ECF No. 58, p. 8, (recognizing these counterarguments), much less undermine the common issues at the "heart" of Plaintiff's claims. And Plaintiff's claims do not depend on seeing his Plan in advance or on the hotel being unstaffed. *See supra* Parts I & II(B)(3). None of these purported defenses defeat certification. *See* 2 William B. Rubenstein, Newberg on Class Actions § 4:55 (6th ed.) ("Affirmative defenses will foreclose a finding that common issues predominate only where they are, for some reason, unusually important or are coupled with other individual issues.").

## IV.    Plaintiff Has Established Superiority.

The proposed class meets the superiority requirement of Rule 23(b)(3). *See* Motion, pp. 15-16. Marriott's principal argument to the contrary again relies on the erroneous assertion that adjudication of Plaintiff's claims would require "individualized trials," *see* Opp., pp. 23-24, which fails for the same reasons Marriott's predominance arguments fail, *see supra* Part II.

In a footnote, Marriott briefly argues that the fact that the proposed class includes foreign class members weighs against a finding of superiority "because a U.S. class-action judgment may not be given preclusive effect in foreign countries." Opp., p. 24 n.14. Marriot does not identify any particular country of concern. Given this lack of specificity, "it is at most a 'possibility' that a defense verdict will have no res judicata effect abroad." *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 135 (S.D.N.Y. 2001) (concluding superiority had been met).

But the Tenth Circuit has recognized that "[c]onsiderations such as class members' . . . geographic dispersal . . . weigh in favor of class certification," including where "'putative class members reside in countries around the world,'" *Menocal*, 882 F.3d at 915, 925 (quoting district court). This weighs in favor of superiority because "the class action device is especially pertinent to vulnerable populations," *id.* at 915 (quoting Newberg on Class Actions), as "it allows for the 'vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all,'" *id.* (quoting *Amchem*, 521 U.S. at 617).

Here, the weight of the relevant considerations weighs in favor of superiority. *See* Motion, pp. 15-16; *see also Cromer*, 205 F.R.D. at 135 ("Even where all the available evidence indicates that foreign plaintiffs who lose in the United States will be able to sue the defendant a second time in their own country, a class action may remain the superior means for litigating the dispute . . .").

## CONCLUSION

For the foregoing reasons, as well as the reasons stated in Plaintiff's Motion, Plaintiff respectfully requests the Court certify the class, appoint Plaintiff as representative of the class, and appoint undersigned counsel as class Counsel.

Dated: July 18, 2025

Respectfully submitted,

*s/Brianne Power*
Alexander Hood
Brianne Power
Towards Justice
P.O. Box 371680, PMB 44465
Denver, CO 80237
Tel.: (720) 239-2606
alex@towardsjustice.com
brianne@towardsjustice.com

*Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on July 18, 2025, a true and correct copy of the foregoing was served electronically on all counsel of record.

*s/Brianne Power*

_____